HENRY C. PITNEY, JOHN R. EMERY, ALFRED REED, FREDERIC W. STEVENS AND MARTIN P. GREY, VICE-CHANCELLORS.

SAMUEL H. GREY, attorney-general, ex rel. HENRY P. SIM-MONS et al., informants, and HENRY P. SIMMONS et al., complainants,

*v.*

THE MAYOR AND ALDERMEN OF THE CITY OF PATERSON.

[Filed March 6th, 1899.]

1. Owners of land on the banks of a stream are entitled to have the water flow to them unpolluted.

2. Owners of different parcels of land on the banks of a river may join as complainants to enjoin the discharge of sewage polluting the river. Such a joinder is not precluded by the fact that one of the owners is a large city, alleging special injury, occasioned by the fact that a valuable pumping plant erected on the banks of the river, as a means of supplying the city with water under a grant from the state of a right to take pure water from the river, is rendered worthless.

3. Pollution of a river by the discharge of city sewage gathered from a large area, and caused to flow into the stream by artificially-constructed grades, cannot be justified as a natural and reasonable use of the river.

4. The act (*P. L. of 1868 p. 126*) authorizing the city of Paterson to discharge its sewage according to maps exhibiting sewer outlets in the Passaic river, does not license the city to create a nuisance by discharging such quantities of sewage as will pollute the river.

(1)

5. Riparian owners who sue to restrain a city from discharging sewage into a river as soon as the sewage begins to contaminate the waters are not guilty of laches.

6. Delay of three or four years after such contamination had commenced is excused by *P. L. of 1896 p. 20*, appointing commissioners to suggest a means of dispensing with the necessity of discharging sewage into the river, as the owners might reasonably suppose that an injunction would be unnecessary.

7. In a suit by riparian owners to enjoin the discharge of city sewage into a river, the owners of the houses connected with the sewers are not necessary parties. If they were proper parties, the fact that they are very numerous and could be represented by the city is a sufficient excuse for not making them defendants.

8. Equity will enjoin the contamination of waters creating a public nuisance, though redress may be had on indictment by abatement of the nuisance.

9. Pending a hearing in a suit to enjoin a city from discharging sewage into a river, an injunction may be granted restraining the city from increasing the discharge where the potableness of the water is destroyed and noxious smells arise from the polluted water, which produce general discomfort to the inhabitants along the river, but the city will not be enjoined from continuing to discharge sewage until it has had a reasonable time to provide other means to dispose thereof.

On order to show cause why a preliminary injunction shall not issue, and on demurrer to the information and bill.

*Mr. John P. Stockton, Mr. James B. Vredenburgh* and *Mr. George J. McEwan,* for the attorney-general, relators and complainants.

*Mr. Eugene Stevenson,* for the defendant.

THE CHANCELLOR.

This suit is brought by the attorney-general on the relation of twenty-four persons, who are also complainants, by information and bill, to restrain the city of Paterson, a body corporate of this state, from discharging its sewage into the Passaic river, which flows through that city. The relators and complainants, are riparian owners of lands upon the Passaic river below the city of Paterson. By certain allegations it appears that at least two of them are riparian owners above what is called the "Dundee Dam," constructed across the river below the city of Paterson a few hundred feet above the ebb and flow of the tide in the river. The information and bill do not definitely dis-

Attorney-General v. Paterson.

close the location of the properties of the other relators and complainants or their situation with reference to the tidewater, except in case of the mayor and aldermen of Jersey City. In that case the property is said to be located upon the bank of the river at Belleville, where, as a matter of common knowledge, the court will notice that the tide ebbs and flows and the water is yet, but for the contamination now complained of, fresh and potable.

The information and bill, however, complain generally of injury to specified rights of the other relators which they could not suffer except through riparian ownership above the ebb and flow of the tide and thereby it indirectly alleges such ownership; perhaps not with sufficient certainty, but no such cause of demurrer is assigned.

The common complaint of the relators, complainants and attorney-general is that since 1890 the sewage of Paterson, in constantly-increasing quantities, has been emptied into the Passaic river by the defendant, so that now the daily discharge from its sewers into the river is about seventeen million gallons of refuse and filth consequent upon a population of about one hundred thousand persons, the effect of which discharge is to so pollute the waters of the stream that noxious and offensive odors continually arise therefrom, detrimental alike to the health and comfort of the complainants and relators and the general public in the neighborhood of the river, and so also pollute them that they have become unfit for drinking by either man or beast and for bathing or any domestic use. Thus the complainants are specially injured by deprivation of their rights as riparian owners, and with the public generally by the discomfort and ill health occasioned by the noxious and offensive odors. The complainant Henry P. Simmons urges that he is specially injured in the destruction of an ice business he has established upon part of his wife's riparian land overflowed from the river, and the complainant, the mayor and aldermen of Jersey City, claiming a right in virtue of statute to take from the Passaic river and Belleville a supply " of pure and wholesome water " for the inhabitants of Jersey City, represents that the pumping plant it has erected at a great expense upon its riparian land at Belleville, has been rendered useless by the pollution complained of, and that the

Attorney-General *v.* Paterson.

inhabitants of Jersey City, of whom it is the corporate representative, are injured by being deprived of a pure and wholesome supply of water for their ordinary uses.

Assuming that all the complainant relators except the mayor and aldermen of Jersey City are owners of portions of the banks of the river above the point to which the tide goes, their ownership extends to the middle of the stream (*Attorney-General* v. *Delaware and Bound Brook Railroad Co.*, *12 C. E. Gr. 1, 8, 631; Cobb* v. *Davenport, 3 Vr. 369*), and they are entitled to have the water flow to them unpolluted, that they may use it for their ordinary domestic purposes and, within reasonable limits, for business or other purposes. *Holsman* v. *Boiling Spring Bleaching Co., 1 McCart. 335; Attorney-General* v. *Taylor, 5 C. E. Gr. 415; Gould Wat. 205 et seq.* Their common injury, beyond the discomfort and ill health occasioned by the noxious and offensive odors arising from the water, is in the pollution and consequent deprivation of the uses of the water to which they have a right.

The mayor and aldermen of Jersey City, merely as riparian owner upon a tidal stream, has no right in the waters of the stream distinct from the rights of the general public therein. The adjacency of its property to the water merely affords convenience in the enjoyment of the common rights. The water and the land under it, where the tide ebbs and flows, is the property of the state subject to the right of navigation. *Stevens* v. *Paterson and Newark Railroad Co., 5 Vr. 532; Newark Aqueduct Board* v. *Passaic, 18 Stew. Eq. 393, 397.* But as grantee of the state, of the right to take pure and wholesome water from the river at the location of its pumping plant for the uses of the inhabitants of Jersey City (*P. L. of 1852 p. 419*), it suffers special injury from the pollution of the stream. That injury lies not alone in the depreciation of the value of the plant erected for the purpose of utilizing the right given by the statute but also in the deprivation to the inhabitants of Jersey City of the use of the waters of the Passaic river, for whose benefit the grant was made and whom the corporate relator and complainant represents.

Thus it appears that the pollution of the Passaic river affects

injuriously all the relators and complainants in depriving them of their respective lawful uses of it.

It is objected by the demurrer that the relators and complainants, being the owners of distinct parcels of land along the Passaic, cannot join in such a suit as this. From what has been said of the allegations of the bill it is perceived that they all suffer a common injury—the loss of the same pure and wholesome water and the substitution for it of a polluted and offensive water, from a single cause—pollution from the Paterson sewers, for which one redress is sought in this suit—the stoppage of such pollution. The same is true as to the baneful effect of the noxious odors that arise from the polluted waters. Until the mayor and aldermen of Jersey City ceased to make use of their pumping plant the smells from the water affected all complainants, even the inhabitants of Jersey City, through the water delivered to them in the same way, and now affects all other complainants than the mayor and aldermen of Jersey City in this way.

The contention is that the injury to each complainant and relator is distinct in that the parcel of land of each is affected independently of the others. The import of the insistence is illustrated in the case of *Marselis* v. *Morris Canal Co., Sax. 31,* where several persons, having distinct and independent interests, joined as complainants to prevent the entry of the defendant corporation upon their several parcels of land and excavating the same for the purpose of making a canal without making compensation to the complainants respectively for their several properties. Each complainant there had a distinct and independent cause of complaint, to wit, for the excavation of his or her lot, which was in nowise injurious to his or her co-complainants. As Chancellor Vroom there said, " there was no general right to be established and no common interest in all the complainants centering upon the point in issue in the cause—no general right claimed covering the whole case." In the same trend is *Hinchman* v. *Paterson Horse Railroad Co., 2 C. E. Gr. 75,* where owners of distinct parcels of land abutting on Market street, in Paterson, asked for an injunction to restrain the building of a horse railroad in that street because it would obstruct the use of the street and injure the value of abutting properties

and take portions of the several complainants' respective parcels of land for public use without just compensation, Chancellor Green declared that the complainants sought to enforce several distinct claims and not to enforce a common right nor to obtain relief against a common wrong. And in *Morris and Essex Railroad Co.* v. *Prudden, 5 C. E. Gr. 530,* where the court of errors and appeals held that several proprietors of distinct plots of land fronting upon a highway were improperly joined as relators in an information by the attorney-general to restrain the operation of a steam railway running longitudinally through the highway upon the ground of injury to each in the enjoyment of his property, and in *Demarest* v. *Hardhan, 7 Stew. Eq. 469,* where Vice-Chancellor Van Fleet held that the owner and lessee of a building shaken by a steam engine in adjoining property, were misjoined in a bill to restrain the operation of the engine, the one claiming injury to his building and the other claiming injury to his business, and in *Davidson* v. *Isham, 1 Stock. 186,* where several owners of distinct tenements joined in a bill to restrain the operation of a drug-mill because of the offensive smokes and smells emitted, one of them also claiming injury because of the jarring of his buildings by the operation of the machinery in the drug-mill. In this case, however, the suit was retained because of the alleged common injury from the smokes and smells. After the decision in the *Prudden Case, supra,* Chancellor Zabriskie, in virtue of the powers vested in him by law, promulgated this rule of court, now numbered 132 : "Any number of persons severally owning or possessing distinct tenements, injuriously affected by a common nuisance or other common grievance, may join in a bill for injunction or relief, provided that it shall be in the discretion of the chancellor to strike out of the bill any of such complainants, when, in his opinion, the justice of the case or convenience of proceeding shall require it." It cannot be questioned that in case of a slaughter-house erected in a populous part of the town, emitting offensive and deleterious odors that are diffused throughout the neighborhood and contaminate and pollute the air, all injuriously affected may join in the same suit, for in such a case the injury is clearly a common one and the object of the suit is to

give protection to each suitor in the enjoyment of the common right of all, to pure, uncorrupted air. In *Rowbotham* v. *Jones*, *2 Dick. Ch. Rep. 337; S. C. on appeal, 3 Dick. Ch. Rep. 311*, two owners of distinct dwellings were held to have properly joined in a bill for injunction to restrain the operation of a neighboring lunatic asylum, from which lunatic patients were permitted to wander unattended, and in which such patients were accustomed to scream loudly and distressingly for great lengths of time, and to indecently expose their persons at the windows of the asylum, the injury being a common one, affecting each in the same way though not at the same moment, in the enjoyment of his property.

In *Reid* v. *Gifford, Hopk. Ch. 416*, a watercourse was diverted from its old and natural channel, and the several owners of distinct parcels of land upon the old channel united in a bill to restrain the diversion. Chancellor Sanford, in holding that the complainants had properly joined in their bill, expressed himself in this language: "The complainants are several proprietors of distinct lands and mills and of separate parts of the natural watercourse; and the defendants object that these complainants, having distinct rights, cannot join in this suit. This objection seems more specious than solid. The rights of the several complainants to their respective lands are indeed distinct, but the grievance in question is a common injury to all the complainants. The water in its natural descent from the lake becomes the property of each of the complainants successively; all the complainants thus have right in the same subject, and the nature of the case forms a community of interest in the complainants. One creditor may sue in equity for himself and other creditors having like rights, and yet the debts demanded are distinct and arise from separate contracts. The common claim of the different creditors to the same relief is considered in equity as one demand and separate suits are not necessary. The rule in equity is that matters which may be demanded by one suit must be of the same nature. This suit is founded on the injury done to all the complainants; the wrong is done or continued by all the defendants; it is a matter of one nature, and the relief sought by all the complainants is the same."

In *Ballou* v. *Inhabitants of Hopkinton, 4 Gray 324,* Chief-Justice Shaw said : "Although the plaintiffs are several owners of separate and distinct mills injured by the alleged stoppage, diversion and waste of the water of Mill river, and to recover damages for which each owner must bring his several action at law to obtain a remedy for this particular injury, yet they have a joint and common right in the natural flow of the stream and in the reservoir by which its power is increased, and a joint interest in the remedy which equity alone can afford in maintaining a regular flow of the water of the reservoir at suitable and proper times so as best to subserve the equal rights of them all. The remedy in equity therefore would, by one decree in one suit, prevent multiplicity of actions."

In *Cadigan* v. *Brown, 120 Mass. 493,* owners of several lots joined in a bill in equity to restrain a continuous and permanent obstruction of a passageway in which they had a right of way in common as appurtenant to their several estates. Upon the question whether they had properly joined in the suit, the court said : " The plaintiffs, though they hold their rights under separate title, have a common interest in the subject of the bill. They are affected in the same way by the acts of the defendants and seek the same remedy against them. There is no danger of confusion in the trial or of injustice to the defendants from the joinder of the plaintiffs, but the rights of all persons can be adjusted in one decree and a multiplicity of suits is prevented."

The case considered is stronger in justification of joinder of the complainants than any of these. Each has the right to have the identical water reach him in its pure, natural condition, except as the proper domestic and reasonable uses of the riparian owners above him may affect it. Above them all a riparian owner, for its own advantage, deliberately defiles, pollutes and corrupts that water, so that when it passes to those below it is burdened with noisome stenches and is utterly corrupted and unfit for the uses they each had the right to make of it. Can they not join, as may those affected by the common air defiled by the smells of a slaughter-house, in an appeal to this court not to award each his damages but to stop the defilement ?

The rule governing the joinder of complainants in a suit like

the present is one of good order and convenience to prevent con-fusion and the evils attendant upon it. I perceive no reason, founded either upon danger of confusion or danger of injustice, which should induce me to hold that the complainants or re-lators are misjoined in this case. It is true that the information and bill emphasize the magnitude of the injury to Henry P. Simmons and to the mayor and aldermen of Jersey City, but nevertheless the injury to them is the common injury to the common right to pure and unpolluted water, differing only in degree from the injury to others according to the uses made of the right. But if administration of justice or if convenience shall hereafter so require, they or either of them may be stricken from the bill and information under rule 132.

It is objected also that the defendant has the right to empty its sewers into the Passaic river, whatever the consequences may be. This contention rests in part upon the ground that it is a natural and reasonable use of the river, and in part upon the insistence that legislative authority to the city of Paterson to construct sewers contemplated their discharge into the Passaic and impliedly authorized it.

The sewage in question, it is remembered, is discharged into a stream above tide and where the stream is not navigable. It does not naturally flow to the stream. It is gathered by the municipality of Paterson in sewers from numerous buildings, cesspools, culverts and drains, over a large area of land, and by uniform artificially-constructed grades is gravitated to and dis-charged into the river. It is vastly more than the mere natural drainage of riparian owners. I cannot conceive of any tenable ground upon which such drainage can be classed as either a natural or reasonable use of the river. Upon this subject I need only repeat the language of Vice-Chancellor Pitney, in *Beach v. Sterling Iron and Zinc Co., 9 Dick. Ch. Rep. 76*, where, in treating of the drainage of a mine into a stream, he said: "The argument was advanced by the defendant that the use of the defendant's property for mining purposes is what was termed, unfortunately, I think, by Lord Cairns, in *Fletcher v. Rylands, L. R. 3 Eng. & Ir. App. 330* (at *pp. 338, 339*) (*1868*), a natural user, and similar in that respect to plowing a field, and that if it

be unlawful for the defendant here to cast into the stream the muddy waters from its mine, it is also unlawful for the farmer to plow his land and allow the muddy waters which run from it after a heavy rain to reach the river. But the very statement of the two cases shows the absence of analogy between them. In the first place, the water from the plowed field comes thereon by natural causes beyond the farmer's control and runs by gravity to the stream, while in the case of the mine the water is, as here, found and raised by artificial means from a level far below that of the river, and would never reach it but for the act of the miner; and in the second place, by the common law of the land, every owner may cultivate his land without regard to its effects upon his neighbor, while such is not the law as to mining. The supreme court of Ohio, in *Columbus Company* v. *Tucker, 48 Ohio 41* (at *p. 58*), repudiates the notion that mining was a natural use of land in the sense that farming is.

"The ground of a reasonable natural user seems to be at the bottom of what was said in *Merrifield* v. *Worcester*, *110 Mass. 216*, upon this topic. So far as the expressions there used favor the notion that a city or town may collect and discharge sewage matter into a fresh-water stream, to the injury of a riparian owner without liability to action, they are contrary to the law as held in England for centuries. *Higg. Pol. W. 127 et seq.,* where several cases besides those above cited are collected."

I am referred by counsel to three statutes for the authority under which the sewers of the city of Paterson have been constructed—the first, "An act to authorize the construction of sewers and drains in the city of Paterson," approved February 26th, 1868 (*P. L. of 1868 p. 126*); the second, "An act to provide for the more efficient government of the city of Paterson (*P. L. of 1871 p. 808*), and the third, "A general act to authorize cities to construct drains and to provide for the costs thereof" (*P. L. of 1882 p. 60*); but I do not find that either of these laws makes reference to the ultimate disposition of the sewage or to the use of the Passaic river for that purpose. The first of them does refer to maps theretofore prepared, and it is possible that those maps may exhibit sewer outlets for discharge of sewage into the river; but at present the maps are not in the

case. And if it be assumed that the maps make such an exhibit it does not follow that the statutes mean to authorize a nuisance. The authority conferred is limited to mere construction of the sewers in accordance with the maps. It does not license either public or private nuisance through pollution of the waters of the river. As to private rights, I need only say that they have constitutional protection against any such legislative enactment. In England, where the power of parliament is omnipotent in matters of this kind, both as to public and private rights, it is well settled that legislative authority to merely drain into a stream does not authorize the contamination of the water. Legislative license to create a public nuisance of the kind considered must be given in express terms or by absolutely necessary implication. *Goldsmid* v. *Tunbridge Wells Improvement Commissioners, L. R. 1 Ch. App. 348; Attorney-General* v. *Birmingham, 4 Kay & J. 528; Attorney-General* v. *Leeds, 5 L. R. Ch. App. 583; Attorney-General* v. *Colney Hatch Lunatic Asylum, L. R. 4 Ch. App. 153; Clowes* v. *Staffordshire Potteries Water Works Co., L. R. 8 Ch. App. Cas. 125.*

That the city of Paterson has any right to pollute the waters of the Passaic river by the discharge of its sewage into them is clearly an untenable proposition.

It is further urged for the defendant that the relief asked should not be afforded in equity because of the laches in this application. The allegations in the information and bill show that since about the year 1890 the city of Paterson has been discharging its sewage into the Passaic river in considerably-increasing quantities, and that since the year 1895 the waters of the river have been corrupted so as to create the nuisances complained of.

I do not perceive that the defendant has suffered by the delay of which it complains. It would seem that to it the delay has been rather a benefit in relieving it of the expense of other disposition of its sewage and in enabling it to consider the most economical and advantageous way of ultimately making that disposition. The Passaic river, at Paterson, is a stream of considerable size, capable of receiving comparatively large quantities of refuse matter without becoming contaminated. Besides,

as appears by an examination of the case of *Newark Aqueduct Board* v. *Passaic, 18 Stew. Eq. 393,* in the flow of the stream constant purification of water is going on. It follows that the mere discharge of sewage into the river by the defendant, a municipality acting presumably advisedly, did not justify an assumption that the discharges of sewage would be allowed to so increase as to create the nuisance complained of. The presumption would rather be that the defendant would not do that which was unlawful. *Attorney-General* v. *Leeds, supra.* But from the time at which the contamination became an accomplished fact the duty of the relators and complainants was plain. Performance of the duty, however, was fraught with important consequences to the defendant as the representative of one hundred thousand people to be affected, and as well to other municipalities along the stream. A difficult question in political economy was presented—how five hundred thousand people living along the river were to be protected against their own sewage. This question led the legislature of the state, in 1896 (*P. L. of 1896 p. 20*), to take the matter of the drainage of the valley of the Passaic river into its consideration and to enact a statute under which commissioners were appointed to examine into the question presented and to suggest a solution of it. The sequel was that commissioners were appointed and they recommended the construction of a trunk sewer that would carry all the drainage then poured into the Passaic to the Newark bay. I think that the effect of this action upon the part of the state induced the hope of an amicable termination of the grievances to which the complainants and relators were subjected and suggested an avoidance of the undertaking involved in this suit, and it seems to me that it suffices as an excuse for what delay there has been in making this application.

Another objection made by the demurrer is that owners and occupiers of houses in the city of Paterson connected with the sewers constructed should be made parties to this application. The sewers do not belong to those persons. They are the property of the defendant, and the defendant is charged with the duty of keeping them in repair and suitable condition to afford drainage for the properties connected with them. The question

considered is not the destruction of the sewers, but as to the disposition of the sewage they are designed to carry off. Moreover, if those who have paid for the sewers by assessments, or their grantees, are proper parties, the fact that they constitute a very numerous body and are well represented by the defendant, their trustee, is a sufficient excuse for not making them defendants.

I will overrule the demurrer, with costs.

It remains to determine what disposition shall be made of the order to show cause herein why a preliminary injunction shall not issue. The complainants ask that it shall not only prevent any increase of the quantity of the sewage discharged into the river by the defendant, but that it shall at once stop all discharge of sewage by the defendant into the river.

The defendant objects that although the jurisdiction of this court in matters of nuisance, public and private, is well established, the jurisdiction does not rest upon the mere fact that nuisance exists, but upon the lack of adequate remedy at law in the given case, and that the court will not exercise its jurisdiction if the object may as well be obtained in the ordinary tribunals; that in this matter, upon indictment adequate redress by abatement of the nuisance complained of may be had. The rule invoked has been repeatedly recognized and applied in this state in cases of alleged obstruction to navigation (*Attorney-General* v. *New Jersey Railroad and Transportation Co.*, *2 Gr. Ch. 136 ; Attorney-General* v. *Paterson and Hudson Railroad Co.*, *1 Stock. 526 ; Attorney-General* v. *Delaware and Bound Brook Railroad Co.*, *12 C. E. Gr. 1*); and in cases of encroachments upon public highways, (*Attorney-General* v. *Heishon, 3 C. E. Gr. 410 ; Attorney-General* v. *Brown, 9 C. E. Gr. 90 ; Morris and Essex Railroad Co.* v. *Prudden, 5 C. E. Gr. 530 ; Inhabitants of Woodbridge* v. *Inslee, 10 Stew. Eq. 397 ; Township of Raritan* v. *Port Reading Railroad Co., 4 Dick. Ch. Rep. 11*); but I do not find a case in which it has been applied where physical discomfort and ill health are in question. On the contrary I recall two cases, *Babcock* v. *New Jersey Stock Yard Co., 5 C. E. Gr. 296, 299*, and *Attorney-General* v. *Steward and Taylor, 5 C. E. Gr. 415*, in which it was held in this court that the contamination of waters so as to

create a public nuisance would be restrained. So the course of the equity tribunals in England is to interfere in such cases. The defendant has presented affidavits which, with the affidavits annexed to the bill, show very conclusively to my mind that if an intolerable nuisance does not already exist above the Dundee dam, a pollution that is well-nigh intolerable does exist, and that it is principally caused by the defendant's sewage. Some filth flows into the river directly from factories in the city of Paterson, but the bulk of the polluting matter above the Dundee dam comes from the defendant's sewers. Below the dam, where the tide ebbs and flows and sewage from other cities and towns and factories may be washed by the tide up the stream, it is more difficult to say that the stoppage of the drainage of the defendant's sewers into the river would abate the nuisance. A large portion of the filth there comes from cities and towns whose combined sewage is more than double that of the city of Paterson. As I calculate from the data before me, the volume of the pure water in the Passaic river below tidewater is upon the ratio of one hundred millions of gallons to between sixty and seventy millions of gallons of filth. The proofs appear to indicate that both above and below the Dundee dam the potability of the water, without the use of some means of purification, is destroyed, and also that noxious smells arise from the polluted water, which, though perhaps not yet unhealthy, produce general discomfort to the inhabitants along the river, and that with the ever-increasing sewage of the defendant must come a corresponding increase of discomfort and presently disease. In this situation it appears to be very plainly my duty to take cognizance of the case and now restrain the defendant from doing anything that will increase the quantity of its sewage pending final hearing herein. *Attorney-General* v. *Luton Local Board of Health, 2 Jur. (N. S.) 180, 182.* Further relief should await the final hearing, not only because full and final relief should be withheld until then (*Pennsylvania Railroad Co.* v. *National Docks, &c., Railway Co., 8 Dick. Ch. Rep. 178, 194,* to admit of all possible light being thrown upon the subject, but because of the impossibility of immediate provision of other means for the disposition of the sewage. The legislature, since 1896, has had its commission engaged in efforts to

solve the question what should be done with the sixty or seventy millions of gallons of sewage now draining into the river without satisfactory result, and it would not be just to require the defendant to act upon this difficult proposition without reasonable time for deliberation. The English courts have so treated cases of this kind. *Attorney-General* v. *Colney Hatch Lunatic Asylum, supra.* So, also, this course was adopted in *Morgan* v. *City of Danbury, 67 Conn. 484.*

An injunction may issue, as indicated.