179 N.J. Super. 409 (1981)
432 A.2d 525
BIRCHWOOD LAKES COLONY CLUB, INC., PLAINTIFF-RESPONDENT,
v.
THE BOROUGH OF MEDFORD LAKES, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 20, 1980.
Decided May 28, 1981.
*412 Before Judges SEIDMAN, ANTELL and LANE.
Edward A. Kondracki argued the cause for appellant (Davis & Reberkenny, attorneys).
Matthew R. McCrink argued the cause for respondent.
The opinion of the court was delivered by SEIDMAN, P.J.A.D.
*413 Plaintiff, an organization representing the residents of the Birchwood Lakes area in the Town of Medford, filed a complaint against the Borough of Medford Lakes in July 1975 for compensatory damages resulting from the pollution of a lake by effluent from the borough's sewage treatment plant and also for injunctive relief under the Environmental Rights Act, N.J.S.A. 2A:35A-1 et seq. Recovery was sought for the cost of treating the lake with chemicals and of dredging it to remove the accumulation of algae and aquatic plants.
At the conclusion of a lengthy trial of the damage action the jury, in response to interrogatories submitted to it by the trial judge, found the borough negligent in "failing to discharge a duty to take corrective steps to prevent the excessive discharge of nutrients from its sewer plant," and in failing to observe the conditions of a permit issued in 1974 by the United States Environmental Protection Agency under the provisions of the Federal Water Pollution Control Act, 33 U.S.C.A. §§ 1251-1376. Damages were awarded to plaintiff in the amount $45,000. Subsequently, the trial judge granted plaintiff's motion for an award of $2,500 for expert witness fees, but denied its request for injunctive relief and also denied defendant's motion for a new trial.
The borough appealed from the adverse judgment and from the award of expert witness fees. The principal issue involves the tort liability of a municipality for pollution of a private lake by effluent from its sewage treatment plant. We address first, however, the fee award.
The $2,500 award was clearly erroneous. The statute invoked by plaintiff in support of its application, the Environmental Rights Act, N.J.S.A. 2A:35A-1 et seq., empowers any person to maintain an action in a court of competent jurisdiction to enforce or to restrain the violation of any statute, regulation or ordinance designed to prevent or minimize pollution, impairment or destruction of the environment. N.J.S.A. 2A:35A-4. *414 There is no provision in the act for the recovery of money damages. However, the act does not supersede any existing civil remedy available to any person. N.J.S.A. 2A:35A-12. On the matter of fees, the court is authorized in any action under the act to award the prevailing party reasonable counsel and expert witness fees not exceeding a total of $2,500. N.J.S.A. 2A:35A-10. To the extent that the complaint here sought injunctive relief, it was plainly an action under the act. But since such relief was denied by the trial judge, plaintiff was not the prevailing party in such action; consequently, the underpinning for the award of expert witness fees was lacking. The order granting such fees must therefore be reversed.
Turning to the liability issue, we summarize the relevant facts, most of which are substantially uncontroverted. The borough constructed and began operating a sewage treatment plant in 1939. The plans were approved by the State Department of Health, which had jurisdiction at the time. Extensive alterations and improvements were made in 1964 or 1965. As before, the plans were approved by the Department. The result was "[b]asically a complete new plant leaving a couple of the items from the original plant." Treated sewage effluent from the plant flowed into an adjacent stream and then for a distance of approximately 500 feet into Birchwood Lake, a privately owned body of water that had been created out of a cranberry bog in the 1950's. Residents of the Birchwood Lakes area began to notice mats of algae in the lake in 1969. By the early 1970s the lake had become unusable for swimming, fishing or canoeing because of the proliferation of algae and aquatic plants. Following complaints by concerned lakeside residents, an investigation of the problem was conducted under the supervision of Frank Takacs, Principal Biologist of the Division of Water Resources, Department of Environmental Protection, from November 1971 to February 1972.
A report was issued in March 1972. It described the lake as a shallow, artificial impoundment of water in which nutrients tend to accumulate, thereby increasing the potential of biological *415 growth and influencing the eutrophication of the lake.[1] Because phosphorus, of which one-third is phosphate and which is present in low concentration in most natural bodies of water, is essential to plant growth processes, eutrophication in impoundments is controlled by the reduction of phosphorus input. Phosphorus concentrations should not exceed .05 mg. per liter where streams enter a lake, reservoir or other standing body of water. The input of phosphorus into the lake here involved was directly affected by the plant effluent. The flow contained phosphorus substantially in excess of the Department's standards. Takacs recommended that the plant should "cease, resolve and control the discharge of excessive phosphorus concentrations into the waters of Upper Birchwood Lake."
On September 27, 1972 the Department of Environmental Protection issued an order, the preamble of which stated that the sewage treatment plant "is inadequate in unit design to properly care for, treat and dispose of sewage" before the effluent is discharged into the lake and ultimately "to the Southwest Branch of Rancocas Creek, a tributary to the Delaware River," thereby "causing or threatening injury to the inhabitants of this State either in their health, comfort or property in violation of R.S. 58:12-2." The order stated further that "the sewage treatment plant must be altered in a manner approved by" the Department. The borough was directed to "initiate and thence make such disposition of its sewage" prior to December 31, 1972, as would be approved by the Department. The abatement of the pollution was to be "accomplished in a manner as to be in conformity with" the Department's water quality management plan for the area.
*416 The borough's attorney objected to the order, stating that it was "unclear and ambiguous" and that "the governing body has an obligation ... to spend their money wisely...." Correspondence was exchanged and meetings were held to discuss the abatement of the pollution by removing phosphates from the effluent. Negotiations between the borough and the Department led to the Department's issuance of a construction permit in June 1974 for additions and improvements to the plant. The borough adopted an ordinance authorizing the capital improvement and appropriating the sum of $74,000 to be raised by the issuance of bonds. Specifications were prepared and bids were solicited, but all the bids received were considerably in excess of the estimated cost and were rejected.
The Department continued to press the borough to act and then filed a suit to compel the borough to abate the pollution. A consent judgment was entered June 27, 1977. It provided that by August 22 of that year the borough would obtain a federal public works grant to finance the construction of an experimental nutrient control pond and the conventional chemical treatment plant for which the Department had issued a permit in June 1974. Upon the receipt of the award and all necessary governmental approvals the borough would immediately construct the facilities for which funding was received. If the federal grant was not forthcoming, the borough would proceed forthwith to construct and operate the nutrient control pond pending the completion of the ongoing study of regional sewage treatment needs and facilities. If the study recommended upgrading the sewage treatment plant, the borough would have one year to obtain federal funding, otherwise the borough would have to finance and implement the upgrading itself. Finally, the borough agreed that if the regional study should recommend that the borough abandon its existing facilities and join a regional sewage treatment system, it would comply. The time for implementing the consent judgment was thereafter extended to August 31, 1978, with all construction to *417 be completed by January 2, 1979. The record does not disclose the current status of the matter.
At the trial plaintiff advanced several theories of negligence on the part of the borough, all of which were submitted to the jury for consideration, together with written interrogatories: active wrongdoing prior to July 1, 1972 (the effective date of the Tort Claims Act, N.J.S.A. 59:1-1 et seq.) which was a proximate cause of plaintiff's damage; negligent construction of the sewage treatment plant; actual or constructive knowledge by defendant that it was operating the plant "in a manner which was damaging plaintiff's lake by reason of which a duty arose, a duty on the part of the defendant, to correct the problem" and defendant's failure to discharge its duty resulting proximately in the damages complained of; defendant's failure to observe the conditions of the federal operating permit, to obey the departmental order and to obey the consent judgment, and negligent operation by defendant of the sewage treatment plant. Defendant voiced no objection to the trial judge's instructions to the jury, so that any complaints now made with respect to them would come to us on a claim of plain error. Although the correctness of portions of the charge is debatable, the jury's responses to the interrogatories mooted to an extent such errors in the charge as may have existed and, moreover, significantly narrowed the scope of the appeal.
The jury was asked to state whether defendant was negligent in the operation or in the planning and design of the sewage treatment plant. The response to each inquiry was "No." Another interrogatory, also answered in the negative, was whether defendant was negligent "in the response to the Department of Environmental Protection Order" issued in September 1972. There was an affirmative answer to the further inquiry whether defendant was negligent "in its response to the Department of Environmental Protection Judgment" entered in July 1977, but the jury also found that such negligence was not a proximate cause of any damage.
The jury answered "Yes" to the remaining interrogatories:

*418 Was the defendant negligent in failing to discharge a duty to take corrective steps to prevent the excessive discharge of nutrients from its sewer treatment plant?
Was the defendant negligent in failing to observe the conditions of its operating permit? (Issued May 30, 1974)
Taking into consideration all of the theories advanced by Plaintiff, or several of these theories (but less than all), do you find the Defendant has been negligent with respect to those theories?
In each of these instances the jury also determined that the negligence was a proximate cause of the damage.
The finding of negligence with respect to the federal permit issued in May 1974 warrants scrutiny since it is apparent to us that there is insufficient factual support in the record for either the submission of the issue to the jury or its response thereto. The permit, entitled "National Pollutant Discharge Elimination System  Permit to Discharge," was effective for a five-year period commencing May 30, 1974. It authorized the permittee to discharge pollutants in compliance with the provisions of the Federal Water Pollution Control Act, 33 U.S.C.A. §§ 1251-1376. Such discharge of pollutants was governed by the general conditions set forth in the permit and the effluent limitations specified therein. It is unclear whether the permit was intended to cover the existing sewage treatment plant or was limited to the proposed enlargement and alteration for which the construction permit was issued by the Department of Environmental Protection on March 6, 1974. In any event, we surmise that the alleged failure by the borough to observe the "conditions of its operating permit" pertained to the excessive concentration of phosphorus in the effluent, though the trial judge's instructions to the jury on the issue were singularly sparse and obscure, consisting in the main of the bare statement that "defendant had a duty to act reasonably with respect to its operating permit."
In general, the effluent limitations in the permit were to be operative as of the effective date of the permit. But the requirement for treating the effluent so as "to contain a total phosphate concentration of no more than 1.5 mg/1 as phosphate *419 [.05 mg/1 of phosphorus] in accordance with the State of New Jersey permit to construct and operate No: S-11-73-4841 dated March 6, 1974," was to begin "on the date determined by condition C.1." This condition, contained in Section C, "Special Conditions," is captioned "Schedule of Compliance for Effluent Limitations." It made note of information from the Department of Environmental Protection that the then existing level of sewage treatment did not produce a discharge meeting the required effluent limitations. The permittee was directed to comply with the Department's schedule by initiating construction of the phosphate reduction facilities by May 30, 1976 and completing the same and commencing operation by October 30 of that year.
We cannot tell from the record whether the postponement of the phosphate concentration requirement to a later date was noticed by the jury, or even by counsel and the trial judge. If the jury's response to the interrogatory relating to compliance with the federal permit constituted a finding that the borough, prior to October 1976, was derelict with respect to the phosphate level, the finding lacks support in the record, since the borough was not obliged under the federal permit to comply with that requirement until the completion of the reduction facilities in the Fall of 1976. And if we should assume that the finding related to the borough's failure to construct the facilities, the proofs do not indicate whether additional damage to the lake occurred after October 1976. Thus, if the outcome of this appeal were to depend solely upon the jury's response to the particular interrogatory relating to compliance with the federal permit, we would seriously consider a reversal and remand for a new trial.
There is, however, the further broad finding by the jury that the borough failed "to discharge a duty to take corrective steps to prevent the excessive discharge of nutrients from its sewer treatment plant." This is the significant issue, implicating as it does such matters as the nature of the duty imposed by law upon the borough, whether there was a breach of that duty and, if so, whether the cause of action occurred before or after the *420 effective date of the Tort Claims Act, N.J.S.A. 59:1-1 et seq. As to the latter, the issue of immunity, if any, is also involved.
We emphasize that the jury's findings removed from the case any issue of negligence in the design, construction or operation of the plant. If the effluent contained a concentration of phosphorus in excess of allowable limits, it was because the sewage treatment system apparently did not have the capacity to reduce the concentration to allowable limits. The problem could be resolved, short of shutting down the plant, only by the construction of additional facilities capable of producing the desired reduction. While the jury here found that the borough negligently failed in its "duty to take corrective steps" to prevent the excessive concentrations of the nutrient, at the same time it also absolved the borough of negligence in its "response" to the 1972 order of the Department of Environmental Protection. Since the order called upon the borough to correct the condition by altering the plant in a manner to be approved by the Department, and since the only viable "corrective step" would be such alternation of the plant, we discern an apparent contradiction in those findings.
In any event, it is important to note that plaintiff's asserted cause of action, though couched in traditional negligence terminology, was necessarily grounded in the pollution of the lake by effluent from the borough's sewage treatment plant. Where discharge of effluent from a sewage disposal plant into a stream causes an invasion of a person's interest in the private use and enjoyment of a lake into which the effluent flows, the operator of the plant may be subject to liability for creating and maintaining a nuisance, but only if the invasion is unreasonable. See Restatement, Torts 2d, §§ 821A-832 (1979). Cf. Sans v. Ramsey Golf and Country Club, Inc., 50 N.J. Super. 127, 133-135 (App.Div. 1958), aff'd 29 N.J. 438 (1959). The discharge of treated effluent into a fixed water course is not unreasonable per se. This is the thrust of Westville v. Whitney Home Builders, 40 N.J. Super. 62 (App.Div. 1956); see Hanks, "The Law *421 of Water in New Jersey," 22 Rutg.L.Rev. 621, 684 (1968); see, also, 18 McQuillin, Municipal Corporations (3 ed. 1977), § 53.131 at 490.
A sewage treatment plant is an instrumentality which serves a function essential to public health. In this State, and we assume generally elsewhere, the facility must be expressly approved by the particular state agency charged with the responsibility therefor  here the Department of Environmental Protection. At the times here involved, and prior to its repeal and replacement in 1977 by the Water Pollution Control Act, N.J.S.A. 58:10A-1 (L. 1977, c. 74, § 1 et seq., effective July 25, 1977),[2] the then existing statute, N.J.S.A. 58:12-3, forbade the flow into any of the waters of the State of polluting matter from sewage treatment plants "[e]xcept under such conditions as shall be approved by the department." In this regard Judge Conford's comments in Westville v. Whitney Home Builders, supra, are instructive:
... That provision [N.J.S.A. 58:12-3] expressly requires Department approval of any sewage treatment plant "from which the effluent is to flow into any of such waters" ("any of the waters of the state"). It is common knowledge that effluent from a sewage treatment plant must have an outlet in running waters. It is significant that R.S. 58:10-5, which prohibits the discharge into any fresh water (defined as water which may be used for human consumption) of sewage, excremental matter, domestic refuse or other polluting matter, expressly excepts from its proscription the "effluent or other matter" discharged from a sewage disposal or treatment plant approved by the State Department of Health [now *422 the function of the Department of Environmental Protection]. Moreover, R.S. 58:10-10 deals with the regulation and approval by the Department of sewage disposal or treatment plants where effluent is discharged into "any of the potable waters of this state." Each of these enactments gives the Department the right to bring legal action for penalties and injunction to enforce its control.
These acts of legislation, and others (see, e.g., N.J.S.A. 58:12-2), denote a public policy which recognizes the social importance of sewage disposal plants and the necessity of fair and reasonable accommodation to their functioning of the use of the waters of the State for other purposes, even including that of human consumption, a use not involved in the present case.... [at 83-84]
Nonetheless, judicial relief to a person adversely affected is accorded where harm results from an unreasonable use of watercourses in connection with the operation of a sewage disposal plant, although, in such case,
... the existence of an actionable invasion of the unquestionable property right of a riparian owner in the flow of a water course depends upon a weighing of the reasonableness, under all the circumstances, of the use being made by the defendant and of the materiality of the harm, if any, found to be visited by such use upon the reasonable uses of the water by the complaining owner. [Id. at 85.]
It is plain from the foregoing that an injunction at least will lie against one who, in the operation of a sewage disposal plant, unreasonably interferes with another's use and enjoyment of a stream or lake through the pollution of the waterway by effluent from the plant. And such relief may be had although it is a public entity that creates and maintains such nuisance. Apart from case law on the subject, the Environmental Rights Act specifically grants standing to any person to maintain an action to restrain any other person from polluting the environment, and the term "person" for the purposes of the act includes "any political subdivision of the State." N.J.S.A. 2A:35A-3. But the existence of this remedy does not bar a person, in appropriate circumstances, from seeking compensatory damages for such injury to himself or his property as may proximately have resulted from harmful pollution. See 61A Am.Jur.2d, Pollution Control, § 548 at 969 (1981).
The question is whether such relief may be had where the polluter is a municipality. The specific problems to be considered are: Is a municipality that operates a sewage treatment plant where effluent results in the eutrophication of a privately *423 owned lake liable at common law for damages sustained by the owner of the lake? Have the principles of law which applied prior to the enactment of the Tort Claims Act been changed or superseded in any way by the act? Is the borough immune from liability on the facts here present?
The briefs of the parties debate extensively such matters as the procedural limitation of the Tort Claims Act to causes of action accruing after its effective date, July 1, 1972; the accrual of a cause of action in the case of a continuing tort; pre-Tort Claims Act distinctions between proprietary and governmental functions and immunity for liability both before and after the act. We believe, however, that a different approach to the problems will place the issues in clearer perspective.
We need not dwell at length on the differences prior to the Tort Claims Act between the liability of a municipality for injury in the performance of a governmental function and in the performance of a proprietary function. See Visidor Corp. v. Cliffside Park, 48 N.J. 214, 217 (1966), cert. den. 386 U.S. 972, 87 S.Ct. 1166, 18 L.Ed.2d 132 (1967); Cloyes v. Delaware Tp., 23 N.J. 324 (1957); Clay v. Jersey City, 84 N.J. Super. 9, 14 (App. Div. 1964). See also, Ennever v. Bergenfield, 105 N.J.L. 419 (E. & A. 1929); Garrison v. Fort Lee, 92 N.J.L. 566 (E. & A. 1919).
The proprietary-governmental test fell into disrepute with the passage of time. In B.W. King, Inc. v. West New York, 49 N.J. 318, 324 (1967), the court spoke critically of "more or less blind adherence" to the doctrine, "without a real consideration of the reasons which gave birth to that doctrine and of whether, in the light of the general expansion of municipal activity, the doctrine has not outlived its usefulness." In Barney's Furniture Warehouse v. Newark, 62 N.J. 456, 468 (1973), the court intimated that liability would follow where a municipal sewer system expelled artificially collected sewage into a person's home or onto his land. The court said that this result was in accord with prior decisions, citing Gould & Eberhardt, Inc. v. Newark, 6 N.J. 240, 243 (1951); Dohrmann v. Hudson Freeholders, 84 N.J.L. 689 *424 (E. & A. 1913); Kehoe v. Rutherford, 74 N.J.L. 659 (E. & A. 1907). The court added in a significant footnote that although these cases "go off partly on the rationale of `active wrongdoing' in the performance of a governmental function, ... we approve them as subserving justice independently of that approach." 62 N.J. at 468, n. 3. The advent of the Tort Claims Act finally put to rest the disfavored dichotomy. See Tower Marine, Inc. v. New Brunswick, 175 N.J. Super. 526, 533 (Ch.Div. 1980).
We are satisfied, setting aside for the moment the further issue of discretionary or other immunity, that the borough, as operator of a sewage disposal plant, would be subject to liability for compensatory damages if the effluent from its plant unreasonably polluted waters, thereby depriving the riparian owner of the use and enjoyment thereof or otherwise caused injury to such owner. It would not matter that the activity complained of commenced prior to the effective date of the Tort Claims Act and continued thereafter. We perceive no need to bifurcate the cause of action and, as to the liability of the borough for its conduct prior to the Tort Claims Act, revive the outmoded distinction between governmental and proprietary functions and the concept of active wrongdoing in regard to governmental functions.
On the issue of immunity, the borough argues at length that it is entitled to "absolute" immunity for its activity, whether pre-or post-Tort Claims Act, because a discretionary function was involved. N.J.S.A. 59:2-3 exempts public entities from liability (a) for an injury resulting from the exercise of judgment or discretion vested in the entity; (b) for legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature; (c) for the exercise of discretion in determining whether to seek or to provide resources necessary for the purchase of equipment or the construction of facilities or the hiring of personnel and (d) for the exercise of discretion in determining, in the face of competing demands, whether or how to utilize or apply existing resources, unless the determination *425 was palpably unreasonable. As is stated in the Comment  1972 appended to this section of the statute, the provision was intended to codify existing law in New Jersey "which immunizes both public employees and public entities for the exercise of discretion within the scope of employment." See Miehl v. Darpino, 53 N.J. 49 (1968); Bergen v. Koppenal, 52 N.J. 478 (1968); Fahey v. Jersey City, 52 N.J. 103 (1968); Hoy v. Capelli, 48 N.J. 81 (1966); Amelchenko v. Freehold, 42 N.J. 541 (1964).
The argument advanced by the borough is that since the jury found no negligence on its part in the operation of the plant but based its verdict in part upon the borough's failure to take corrective steps to prevent the excessive discharge of nutrients, "[l]iability must have been predicated, therefore, on the failure of the Borough to provide the resources necessary for the purchase of the phosphate removal equipment or the construction of the phosphate removal facilities." The borough's concept is that this discretionary decision is "clearly immune from second-guessing in a tort action for damages" and judicial review of the decision is not permitted. We disagree.
The question of governmental discretion in the context of a municipal sewer system was addressed by the court in Barney's Furniture Warehouse v. Newark, supra. The appeal involved a damage award to plaintiffs against the city for injury to real property and for business losses consequent upon periodic flooding of their properties which resulted from the gradually increasing functional incapacity of the municipal sewer system because of urban development. The trial judge, sitting without a jury, determined that the city was under a duty to remedy the condition within a reasonable time after notice thereof and had breached that duty. The Appellate Division affirmed the judgment. The Supreme Court reversed, holding that there was no support in our law for the position that the city had a positive duty to keep its sewer plant abreast of developing needs and, further, "that too much of the official decision-making process in dealing with such problem at the various phases of its development was grounded in governmental judgment and discretion *426 to permit the sanction of an imposition of damages for the result of its exercise." 62 N.J. at 469. The court said that the conception of the original plan for draining and sewering the area was an exercise of official judgment; that when, thereafter, flooding appeared, governmental judgment and discretion had to be exercised as to whether or when to remedy it, or how, in the face of priorities of need, and, as time passed, considering competing needs and the city's fiscal determination, the problem "never ceased to be one of exercise of discretionary judgment even though the option of continuing inaction on a solution became increasingly less tenable." Id. at 470.
But, the case is particularly instructive and significant in other respects. One is that in considering the controlling principles of law in relation to municipal tort liability for flooding or inadequate drainage arising out of the operation of sewer systems, the court "eschew[ed] any consideration of municipal sewer tort cases involving personal injuries and pollution of private streams, all of those having been dominated by the now fading distinction between governmental and proprietary functions and the related concept of active wrongdoing in respect of the former." 62 N.J. at 464 n. 1. Additionally, while recognizing that a municipality is not liable where a sewer, adequate to carry off surface waters when constructed, becomes inadequate because of the growth of the municipality and the increased demands made upon the system, the court stressed that "[t]his position is qualified to the extent that liability will follow if in actual operation the system expels artificially collected sewage, whether sanitary or storm or both, into plaintiff's home or onto his land." Id. at 468. This is consistent with the view expressed in earlier cases, though in terms of active wrongdoing, that a municipality is liable for a nuisance created by the pollution of a stream through its operation of a sewage disposal plant. See Ennever v. Bergenfield, supra. Similar results have been reached elsewhere. McCuistion v. Huachuca City, 122 Ariz. 341, 594 P.2d 1037 (Ct.App. 1979); Fairwood Bluffs Conservancy Dist. v. Imel, 146 Ind. App. 352, 255 N.E.2d 674 (Ct.App. 1970); Hartzler *427 v. Town of Kalona, 218 N.W.2d 608 (Iowa 1974); Thorson v. City of Minot, 153 N.W.2d 764 (N.D. 1967). See cases collected in Annotation, "Sewage Disposal Plant as Nuisance," 40 A.L.R.2d 1177 (1955).
Actually, we perceive no discretion involved in this case, the exercise of which is shielded by immunity from liability. Municipal judgment was exercised when the sewage disposal plant was constructed and later extensively rebuilt. The resulting effluent, discharged into a stream, polluted plaintiff's lake. While no water is perfectly free from foreign substances, harmful pollution is quite another matter. Cf. Doremus v. Peterson, 73 N.J. Eq. 474 (Ch. 1908). If the invasion of plaintiff's property right was unreasonable considering all the circumstances, it was wrongful and actionable. See 18 McQuillin, op. cit., § 53.59d at 268-269.
A further immunity contention asserted by the borough is based upon N.J.S.A. 59:4-6, which provides that neither the public entity nor the public employee is liable for an injury caused by the plan or design of public property
... where such plan or design has been approved in advance of the construction or improvement by the Legislature or the governing body of a public entity or some other body or a public employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved.
The borough argues that since the plans for changes and additions to the plant were approved not only by the governing body of the borough but also by the State Department of Health, there is "immunity to the Borough of Medford Lakes for any alleged damages resulting from the plan or design of the sewage treatment plant without phosphate removal equipment."
We said in Ellison v. South Amboy Housing Auth., 162 N.J. Super. 347, 351 (App.Div. 1978), decided after the trial of this case, that a public entity's claim of immunity under that section of the Tort Claims Act is a matter of affirmative defense as to which it bears not only the burden of pleading but also the burden of proof. The borough did not include plan or design *428 immunity among the separate defenses pleaded in its answer. See R. 4:5-4. However, the borough raised the issue as one of the grounds for its unsuccessful motion for judgment made at the close of plaintiff's case, and also for the further motion for judgment made at the close of all the evidence. It was argued by both sides, although the trial judge noted at one point that "[t]here may be a question as to whether this defense has been pleaded or whether it has to be pleaded." Consequently, to the extent necessary here, we shall consider the borough's answer amended so as to incorporate therein the affirmative defense of plan or design immunity.
In denying the motion made at the close of the plaintiff's case, the trial judge, addressing the matter of plan or design immunity, said:
The facts of this case, in my opinion, fall squarely within this section and I find that there is immunity which applies to the Borough with respect to the dangerous condition, if that is an accurate description of this sewer plant as planned and designed.
But the trial judge determined that since there were other issues for submission to the jury, such as negligence in the operation of the plant, violation of the conditions of the permit, and failure to take steps to correct the pollution, the borough was not entitled to prevail because of plan or design immunity.
The trial judge's apparent ruling that the borough was entitled to plan or design immunity on "the facts of this case" is of questionable accuracy. To support a claim of such immunity the borough had the burden of proving that the alleged pollution was brought about by the specific plan or design that was the subject of prior governmental approval. Ellison v. South Amboy, Housing Auth., supra at 351. Plaintiff was under no obligation to establish as part of its case the absence of such immunity. The motion for judgment at the end of plaintiff's proofs was, of course, clearly premature. As for the motion made at the close of all the evidence, we find nothing in the record to indicate that the plan or design and the specifications therefor, as approved by the State Department of Health in *429 1964 or 1965, contemplated the production and discharge of effluent that might contain excessive and injurious concentrations of nutrients. See N.J.S.A. 58:12-3. The borough argued that plaintiff had produced no evidence with respect to negligent plan or design. But, as we said, plaintiff had no such burden. We do not take the position that plan or design immunity could not have been established by the borough. The point we make is that the borough did not come forward with proof of the precise scope and content of the Department of Health's approval when the sewage treatment plant was substantially rebuilt. The motion for judgment, insofar as it related to plan or design immunity, should have been rejected on this basis. The trial judge's assumption that N.J.S.A. 59:4-6 accorded immunity to the borough was unwarranted, considering the state of the proofs at the time. But the borough did not move for judgment n.o.v. nor did it renew its claim of immunity on its motion for a new trial. In any event, had it so moved it would have been faced with the same deficiency of proof. We are inclined to doubt, however, that the departmental approval would have licensed either a public or private nuisance through the pollution of the waters here involved. See Attorney-General v. Paterson, 58 N.J. Eq. 1, 11 (Ch. 1899), rev'd on other grounds sub nom. Simmons v. Paterson, 60 N.J. Eq. 385 (E. & A. 1900).
We have carefully considered the remaining points raised by the borough in its brief and, except for the one pertaining to the charge of the court, are satisfied that none is of such substance as to require a reversal.
The borough points to a number of instances of claimed error in the judge's charge. Although the borough voiced no objection to the charge at the trial, we may, in the interests of justice, notice plain error not brought to the attention of the trial judge and we are also free to notice such error even though not raised in the briefs. R. 2:10-2. Most of the borough's assignments of error, if otherwise valid, are no longer of consequence by reason of the jury's exculpatory responses to the interrogatories submitted. Some, however, are of sufficient *430 substance to warrant our thorough consideration in order to determine whether, if error was committed, it was of such nature as to have been clearly capable of producing an unjust result.
Irrespective of whether the issues pertaining to design, plan and operation of the sewage disposal plant should have been submitted to the jury in whole or in part, and without commenting on the correctness of the related instructions to the jury, we note once more that the jury found the borough free of negligence in each respect. The jury reached a like conclusion regarding the borough's "response" to the September 1972 order. Further, while concluding that the borough was negligent in failing to implement the consent judgment, the jury also determined that such negligence was not a proximate cause of plaintiff's claimed injury and damage. Thus, excluding the foregoing and taking into account our previously expressed view with regard to the federal operating permit, there remains for scrutiny only the issue, resolved adversely to the borough, of whether the borough was "negligent in failing to discharge a duty to take corrective steps to prevent the excessive discharge of nutrients from its sewer treatment plant." The problem at this point is to ascertain the source of that duty in light of the jury's other findings. The serious flaw in the charge is the trial judge's failure to anticipate the possibility that the jury might, as it ultimately did, exonerate the borough from negligence in the respects we have mentioned and to instruct the jury accordingly.
The trial judge adverted in his charge to the standard of conduct "which the law requires of all municipalities" and assigned to the jury the task of deciding "whether defendant's conduct measured up in standards of care required of it and, in short, whether the defendant was negligent." Negligence, however, was defined in terms of the general duty of care which a person of ordinary prudence would exercise in existing circumstances. This would not be helpful to the jury in its consideration *431 of the standard of care to be observed by a municipality in the operation of a sewage treatment plant. Although mention was also made of evidence adduced during trial on standards for the construction and operation of sewage treatment plants in this State, and the jury was instructed to consider, on the issue of negligence, whether the borough complied with those standards, it is evident that the jury found no deviation therefrom by the borough.
But a "standard of conduct" was also found by the trial judge in N.J.S.A. 58:12-3, which was in effect at the times here involved. After reading the statute to the jury, he charged that if the jury found that "the defendant has violated that standard thereby injuring the plaintiff, such violation is evidence to be considered by you in determining whether negligence, as I have defined that term to you, has been established." We believe that the instruction as given was inadequate and incomplete and possessed the clear capacity to mislead and confuse the jury.
In general, the import of the statute was to prohibit the pollution of waters by sewage "[e]xcept under such conditions as shall be approved by the department [now the Department of Environmental Protection.]" The first clause, which forbade the building or use of sewer, drain or sewerage systems so designed "that any sewage ... or other harmful and deleterious matter, solid or liquid, shall flow into any of the waters of this state," is not applicable here. The next which has some pertinency, prohibited, except under approved conditions, the building or operating of a sewage treatment plant "from which the effluent is to flow into any such waters." But, since it is undisputed that the plant in this case was designed to discharge effluent into "any such waters" and was approved for that purpose by the department, we fail to see the materiality of the provision to the facts of this case.
The remainder of the section stated that "after the date specified in the notice provided for by section 58:12-2 of this title," no person, corporation or municipality shall "permit any *432 sewage or other polluting matter to flow into such waters from any sewer, drain or sewerage system under its control." If this is the provision a violation of which the trial judge had in mind, then it will be recalled that the September 1972 order of the Department of Environmental Protection, issued under authority of that statute, directed the borough to alter "the sewage treatment plant ... in a manner approved" by the Department and to "initiate and thence make such disposition of its sewage" prior to December 31, 1972, as would be approved by the Department. But the jury found that the borough was not negligent in its "response" to that order. However, we cannot tell to what extent the jury may have applied the statute further in its consideration of the instruction that
[w]hen a condition for which a municipality has a responsibility causing or likely to cause injury arises and its existence is known, or by the exercise of reasonable diligence would be known by the municipality, a duty arises requiring action on the part of the municipality to correct the condition. Its failure to act reasonably in the discharge of its duty is negligence for which it is liable in damages proximately flowing therefrom.
What the borough would be expected to do over and above that which was ordered in general terms in the 1972 order and more specifically in the federal operating permit and the consent judgment was not explained.
Beyond this, and vital to our determination, is the fact that the case was tried and the jury was instructed on a completely inapplicable theory of law. The question presented was whether, by intentionally discharging the effluent, the borough's invasion of plaintiff's interest in the use and enjoyment of the lake amounted to a nuisance. This involved a determination as to the unreasonableness of the invasion, to be arrived at after weighing the gravity of the harm to plaintiff against the social utility of the borough's conduct. See Restatement, Torts 2d, §§ 822, 826-828 (1979). Nowhere in its instructions was the jury told to address these issues which controlled the outcome of the case. In fact, the concept of nuisance is not even mentioned. The answers to interrogatories demonstrate that the recovery for the borough's intentional conduct finds no support in any *433 rational theory of negligence, nor in fact do we understand how the evidence could even have been analyzed in those terms.
By failing to instruct the jury as to nuisance the trial judge precluded consideration of factors which might have compelled a result favorable to the borough. That being so, the omission was clearly capable of producing an unjust result. This conclusion, coupled with the trial judge's error in submitting to the jury without qualification the issue of compliance with the federal operating permit, convinces us that there must be a reversal of the judgment in favor of plaintiff and a remand for a new trial. Since the borough does not contest on this appeal the quantum of damages, the new trial shall be limited to the issue of liability. Should plaintiff prevail on the new trial, judgment will be entered in its favor in the amount previously awarded, plus interest and costs.
We would expect the trial judge to schedule a pretrial conference at which the issues to be tried would be carefully spelled out and the pleadings would be amended to the extent necessary.
Reversed and remanded. Jurisdiction is not retained.
NOTES
[1] Eutrophication is the deterioration of the esthetic and life-supporting qualities of natural and man-made lakes and estuaries caused by over-fertilization from effluents containing phosphates, nitrogen and organic substances. Algae and aquatic plants become excessive and, upon decomposition, produce a sequence of objectionable features.
[2] The Water Pollution Control Act, N.J.S.A. 58:10A-1 et seq., enacted in 1977, gave the Department of Environmental Protection greater powers of enforcement, created a more stringent pollution discharge elimination system, granted more extensive rule-making authority to the department and provided for heavy civil penalties for violations of the act. But the Department was empowered even prior thereto by N.J.S.A. 58-12-2 to notify any person, corporation or municipality found to be polluting waters by effluent from its sewage treatment plant, that, prior to a time to be fixed, but not later than five years from the date of the notice, such pollution must cease and the plant must be so altered, added to or improved that the treatment of the sewage and the discharge of the effluent into the waters would be in a manner approved by the department. In the present case, the order issued in September 1972 was under the authority of this act.