BARNEY'S FURNITURE WAREHOUSE OF NEWARK, INC., KLEEN-STIK PRODUCTS, DIVISION OF COMPAC CORPORATION, LOUIS HOFFMAN & SONS CO., LOUIS HOFFMAN & CO., AND L & F FRELINGHUYSEN CORP., ALL NEW JERSEY CORPORATIONS, PLAINTIFFS-RE-SPONDENTS, v. THE CITY OF NEWARK, A MUNICIPAL CORPORATION, DEFENDANT-APPELLANT.

Argued January 22, 1973—Decided April 9, 1973.

*Mr. Jonathan Kohn* argued the cause for defendant-appellant (*Mr. William H. Walls*, attorney).

*Mr. Norman Bruck* argued the cause for plaintiffs-respondents (*Mr. Gilbert Ehrenkranz*, attorney).

The opinion of the Court was delivered by

CONFORD, P. J. A. D., Temporarily Assigned. The Chancery Division awarded plaintiffs damages against the defendant city in the aggregate amount of about $226,000 for injury to real property and for business losses consequent upon periodic flooding over a period of years upon or adjacent to their properties on Frelinghuysen Avenue in Newark, close to the Route 22 overpass. The court also entered a mandatory injunction ordering the city to "eliminate the flooding" by January 1, 1973 (judgment entered June 22, 1971). The Appellate Division affirmed the judgment as against appeals by both the city and one of the plaintiffs (the latter on an issue of damages), and this court granted certification on the city's petition. 62 *N. J.* 67 (1972). Only issues of liability and remedy are now implicated.

Plaintiffs are corporations owning or leasing industrial or commercial properties. They are all served by the same sewer lines which drain south along Frelinghuysen Avenue—a north-south main road parallel with and near the western edge of the Newark meadows. Under this street are two

separate conduits—one a storm sewer carrying surface water, and the other a sanitary sewer carrying diluted but untreated sewage. These pipes combine into a single line known as the Queens Outlet, which begins underneath the intersection of Frelinghuysen Avenue and Queen Street, a point about a block south of plaintiffs' properties. From this point the sewer runs in an easterly direction along Queen Street a short distance to the Newark meadows where the flow, except for a minor portion which is diverted through the South Side Interceptor to the Passaic Valley Sewerage Commission Treatment Plant located at Delancy Avenue, enters an open drainage ditch known as the Queens Ditch. The flow then proceeds through the meadows *via* a network of open ditches, including the Peripheral Ditch which encircles Newark Airport, and past a series of tide gates into the Elizabeth Channel at Newark Bay. The bay, which is a tributary of New York Harbor, is situated about 2½ or 3 miles east of the Queens Outlet.

Both the South Side Interceptor and the Peripheral Ditch were constructed in the mid-1960's. The former was ordered by the state health authorities in 1954, and the city financed it through a $10,500,000 bond issue. The Port Authority of New York and New Jersey built the Peripheral Ditch as an incident of its enlargement of the Newark Airport. Neither of these projects have materially affected the basic drainage problem of the city which underlies this litigation although the interposition of the Peripheral Ditch has caused an increase in the estimated cost of a solution of the problem. See *infra*.

Other segments of the storm and sanitary sewers on Frelinghuysen Avenue empty into the common outlet to the bay *via* the Waverly and Peddie ditches. Altogether, an area of about 5,000 acres or 8 square miles of the city west and northwest of the meadows is served by this storm water and sanitary sewerage system. The record affords no information as to just when this general system of sewerage-drainage was first instituted, but it does indicate that since

that time there has been a great amount of industrial and airport development in and about the meadows which the ditches traverse and considerable urban development in the upland area drained, west of Frelinghuysen Avenue.

There is specific evidence of flooding on Frelinghuysen Avenue occurring six or more times a year since 1961, causing property damage, serious interruption of traffic, and in one instance, loss of life. Plaintiffs introduced evidence of periodic flooding since 1964 of even greater frequency. Engineering reports in evidence, more specifically referred to hereinafter, make it clear that flooding of the general character described antedated 1961 by a long period of time, perhaps decades.

The premises of two of the plaintiffs, Barney's Furniture Warehouse of Newark, Inc., and Kleen-Stik Products, Division of Compac Corporation, were not flooded; these parties suffered business losses due to the inaccessibility of their premises when the surrounding streets were flooded. Louis Hoffman & Sons, Co. and Louis Hoffman & Co. sustained similar damages as a result of the interruption of their business operations when their loading docks were flooded. The building owned by L. & F. Frelinghuysen Corp. was damaged when its foundation was undermined, apparently as a result of the periodic withdrawal of subsurface support by the force generated by flood waters being drawn into the sewer line. Some 15 to 20 other suits against the city based upon the same grievance are said to be pending.

The cause of the flooding was described in a report prepared in 1961 for the city by the engineering firm of Elson T. Killam Associates, Inc. adduced in evidence by plaintiffs. The Killam Report letter of transmittal states:

"It may be pointed out that the basic reason for these difficulties is that the flow upon an upland area of some 5,000 acres (or 8 square miles), extending westerly as far as the Irvington-Newark boundary; northerly to 12th Avenue, and southerly to the Elizabeth boundary, is dumped at the old shore line of the Meadows with a major portion of

this discharge being concentrated in the Peddie Ditch between the intersection of Route 1 and the Pennsylvania Railroad at a point 2½ miles back from Newark Bay.

The main roads along the edge of the old Meadow in this area have low points at Elev. 106.5, or only 3½ feet above mean high tide in Newark Bay; only 2½ feet above monthly high tide; and 1½ feet *below* recent storm tides.

The difference in level between these streets and high water in Newark Bay, even with normal tides, is not enough to develop sufficient velocity and flow in these long ditches.

The consequent backing up in the ditches causes extensive surcharging of the tributary combined sewers and storm overflows, and with even a moderate amount of rainfall, creates extensive flooding.

The progressive increase in extent, duration and frequency of flooding is due to:

1. Filling of meadowlands with reflected reduction of extensive storage formerly available.
2. Continuous development in the tributary areas with a consequent increase in runoff from impervious surfaces such as streets, roofs, parking areas, runways, etc.
3. Deterioration of channel capacity due to silting.

These conditions will inevitably continue and become progressively worse."

A second major report on the flooding conditions was prepared for the City in 1970 by the engineering firm of James P. Purcell Associates and was received in evidence on behalf of plaintiffs. This described the problem as follows:

"Insufficient slope in the water surfaces of the conveying ditches is a major factor in the cause of flooding. Other than the recently constructed 'Peripheral Ditch', the remaining secondary ditches in the meadows are severely silted, obstructed by debris or by dilapidated timber pilings, and generally severely deteriorated. Hence, conditions of the ditches, compounded by high tide in the Bay, produce surcharges on the contributing outlets. These surcharges are felt as flood waves on the nearest low inlets and subside when the tide in the Bay drops low enough to cause gravity flow towards the tide gate."

Both the Killam and Purcell reports were substantiated by expert testimony. The Killam report clearly indicated that the only feasible way to abate the flooding was to construct a pumping station in the meadows to increase the

velocity of the flow in the drainage ditches. Increasing the size and capacity of the ditches alone would not solve the problem. The Purcell report, however, while agreeing that a pumping station was essential to the solution of the flooding problem, cautioned that it would not be remedied by the construction of the pumping station unless improvements of the storm sewer systems servicing the flooded areas were also made. It noted that the lack of capacity of the Queens Outlet sewer has a "direct and serious bearing on the flooding that occurs on Frelinghuysen Avenue" and recommended that a new pipe line be built. Joseph A. Tombro, an engineer consultant employed by the Purcell firm, testified that many of the sewer pipes were not of adequate size and that the ditches were filled with debris. He opined, however, that dredging the ditches would not, alone, significantly reduce the flooding.

Both the estimated cost and design capacity of the proposed pumping station increased substantially during the 1960's. The estimated cost of the pumping station project in 1961 was approximately $1,300,000 for a planned capacity of 800 cubic feet per second. By 1965 the estimated cost was $2,552,000 for a capacity of 1,200 c.f.s. and by 1968 it had risen to $3,650,000 for a capacity of 1,600 c.f.s. In 1971 it stood at $4,713,852 for a design capacity of 1,800 c.f.s. It was indicated that the final estimated cost would approach $5,000,000 if the project were executed in or about 1971.

The design capacity of the pumping station was periodically enlarged because of the extensive development of the tributary area and an increase in the ditch-conveying capacity of the meadows resulting from construction of the Peripheral Ditch. Much of the substantial increase in the total cost of the project was due to the inclusion of the costs of related improvements of the sewer system other than the pumping station itself — improvements the City eventually realized were necessary in order fully to effectuate the projected flood control program.

The parties sharply dispute the issue as to whether the flood waters at the location of plaintiffs' properties represent to any substantial extent water or sewage expelled from the sewer pipes after having been impounded therein. The city contends that all the water represents either precipitation or water from the meadows which never could enter the sewers because they were already surcharged by backflow from the filled ditches and meadowland overflow. There was little illuminative detail on this point in the proofs and no express finding of fact on the issue by the trial court. Plaintiffs point to a 1960 photograph in the Killam report taken during a flooding episode showing "manholes popping" and water bubbling, purportedly indicative of outflow from the manholes on Frelinghuysen Avenue. Moreover, one of the witnesses for plaintiffs testified to seeing "scum and debris" on the surface of the flood water.

The question posed is of some importance in view of the authorities later discussed imposing liability on a municipality for artificially impounding or redirecting the normal flow of surface water or sewage and casting it upon the land of a complainant which would otherwise be free of it. The proofs aforementioned lead us to conclude that while there may be some back-up of water from the sewers by far the greater portion of the floodwaters, particularly when tides are high and rainfall is prolonged, consists of either precipitation or back-flow of surface water from the meadows which is unable to enter the sewers or ditches because they are already full.

The record also calls for a finding that the flooding is due only in minor degree to what might be described as disrepair of piping or ditches or inadequate maintenance thereof as contrasted with the major impact of the minimal elevation of the flooded area as compared with that of the bay tides and the distance necessarily traversed by the drainage ditches between those locations, abetted by inadequacies

(much more than disrepair) of piping, culvert boxes and other equipment.

In these respects the only findings of the trial court were that the flooding "results when precipitation combines with high tide conditions in Newark Bay" and that the condition can be and could always have been "cured by the * * * construction of a pumping station and incidental improvements in the sewage system so as to force flow the surface water collected and the sanitary sewer effluent into the Newark Bay whenever the flow by gravity or backflow required".

Various city officials including the Mayor attempted to initiate planning and financing proposals for inception of the pumping station project during the 1960's but these were sidetracked either in Council or by the "Project Conference" because of fiscal and priority considerations. Serious financial problems of Newark during the past decade are practically a matter of judicial notice. However, there was evidence at the trial that by the Spring of 1971 the city was on the verge of accomplishing the necessary financing for the project through assistance of the federal and state governments and the Port Authority. The Court has not yet, however, been advised that the project is under way or that effectuation of it is imminent.

On December 19, 1972 this Court on motion of the city stayed the injunctive portion of the judgment until further order of the Court.

At the trial the city's basic defense was that it had not been negligent in the creation or operation of the sewer system but that development of the tributary and meadowland areas, combined with the low elevation of plaintiffs' locations in relation to the bay, made the system inadequate. Provision of the curative pumping station and incidental improvements, in view of the expense entailed, was argued to be a matter of governmental discretion, and it was contended that municipal tort liability does not exist where damage is an incident of the exercise of such discretion.

The *ratio decidendi* of the trial court was not addressed directly to that argument. The court concluded, in relation to its fact findings mentioned above, that the flooding condition had existed for many years prior to 1964 (date incepting period of recovery under statute of limitations) and that "the city was and is under a duty to construct and to maintain a sewer system of such capacity and of such design as to be adequate to collect and to carry off surface waters from rainfall and sanitary sewage * * * which might reasonably be expected to accumulate under normal and ordinary circumstances". The court said that where the experience of the city demonstrates that the existing sewer system is inadequate for normal requirements it is under a duty to remedy the condition within a reasonable time after notice; that the city breached that duty and is therefore liable to plaintiffs for damages proximately resulting therefrom and may be ordered to perform the duty by injunction.

The affirmance by the Appellate Division was on the reasoning of the Chancery Division. We conclude there was error.

There is a paucity of expression by this Court, and by the former Court of Errors and Appeals in this century, as to the controlling principles of law in relation to municipal tort liability for flooding or inadequate drainage arising out of the operation of sewer systems.[1] However,

---

[1] We eschew any consideration of municipal sewer tort cases involving personal injuries and pollution of private streams, all of those having been dominated by the now fading distinction between governmental and proprietary functions and the related concept of active wrongdoing in respect of the former; *e. g., Bengivenga v. Plainfield*, 128 *N. J. L.* 418 (E. & A. 1942) ; *Cloyes v. Delaware Tp.*, 23 *N. J.* 324 (1957) ; *Garrison v. Fort Lee*, 92 *N. J. L.* 566 (E. & A. 1919) ; *Ennever v. Bergenfield*, 105 *N. J. L.* 419 (E. & A. 1929). As to the recent desuetude of those doctrines, in general, see *B. W. King, Inc. v. West New York*, 49 *N. J.* 318, 324–326 (1967) ; *Jackson v. Hankinson and Bd. of Ed. of New Shrewsbury*, 51 *N. J.* 230, 233–235 (1968).

such evidence of the views of New Jersey judges on the subject as is available comports with the philosophy underlying recent expressions of this and other courts concerning the significance of the element of governmental discretion in adjudicating municipal tort liability.[2]

The leading case in this jurisdiction in the area specified above is *Harrington v. Woodbridge,* 70 *N. J. L.* 28 (Sup. Ct. 1903). The precise holding of the court was that a municipality was not liable to a householder for back-up of sewage into his cellar allegedly caused by the construction by the municipality of a sewer line in such a manner that the plaintiff could not "safely" install a house connection with it (*Id.,* at 29). The court explained (pp. 29–30) :

"* * * The general doctrine on this subject is that in devising a plan for the construction of public sewers the public authorities discharge a *quasi* judicial duty, involving the exercise of judgment and discretion with regard to general convenience, and that their wisdom in the performance of that duty is not subject to review in a private suit brought to recover damages because of their error. They owe to no individual the duty of devising such a plan as will afford to him sufficient drainage. *Child v. Boston,* 4 *Allen* 41; *Mills v. Brooklyn,* 32 *N. Y.* 489; *Johnston v. District of Columbia,* 118 *U. S.* 19, 6 S. Ct. 923, 30 *L. Ed.* 75; 2 *Dill. Mun. Corp.* (2d *ed.*) 1046 (801) ; 20 *Am. & Eng. Encycl. L.* (2d *ed.* 1199)."

The court distinguished from the matter before it such cases as those of private damage resulting from lack of repair or from the connection of additional laterals to a sewer whose existing incapacity was already demonstrated, or from the casting into a sewer of "sewage beyond its capacity to con-

---

Nor do we find it necessary to discuss such archaic criteria of municipal liability in this area as whether a sewer flood or back-up condition was an indictable public nuisance as distinguished from a non-indictable private nuisance. See *Jersey City v. Kiernan,* 50 *N. J. L.* 246 (Sup. Ct. 1888) and *Waters v. Newark,* 56 *N. J. L.* 361 (Sup. Ct. 1894), aff'd o. b. 57 *N. J. L.* 456 (E. & A. 1894), discussed in *Weintraub and Conford, Tort Liability of Municipalities in New Jersey,* 3 *Mercer Beasley Law Rev.* 142, 155–163 (1933).

[2] See *Fitzgerald v. Palmer,* 47 *N. J.* 106, 109–110 (1966).

duct to the common outlet so that it must empty itself upon the private property" and the case of a common sewer outlet emptying directly on private property. It was said that in all of such instances the public body is generally held responsible (at 30).

The best known of the cases cited by the *Harrington* court is *Johnston v. District of Columbia,* 118 *U. S.* 19, 6 S. Ct. 923, 30 *L. Ed.* 75 (1886), where the applicable principles were stated as follows:

"The duties of the municipal authorities in adopting a general plan of drainage and in determining when and where sewers shall be built, of what size and at what level, are of a *quasi*-judicial nature, involving the exercise of deliberate judgment and discretion, and depending upon considerations affecting the public health and general convenience throughout an extended territory; and the exercise of such judgment and discretion in the selection and adoption of the general plan or system of drainage is not subject to revision by a court or jury in a private action for not sufficiently draining a particular lot of land. But the construction and repair of sewers, according to the general plan so adopted, are simply ministerial duties, and for any negligence in so constructing a sewer or keeping it in repair, the municipality which has constructed and owns the sewer may be sued by a person whose property is thereby injured." (at 20–21, 6 S. Ct. at 924)

The view that liability does not attach for defects in the general plan of a municipal sewerage system is that generally held. 18 *McQuillin, Municipal Corporations* (1963) § 53.121, p. 463; *Prosser on Torts* (4th ed. 1971), p. 981. See also *Bratonja v. City of Milwaukee,* 3 *Wis.* 2d 120, 87 *N. W.* 2d 775 (Sup. Ct. 1958) and *Beck v. City of New York,* 23 Misc. 2d 1036, 199 *N. Y. S.* 2d 584, 591 (Sup. Ct. 1960), aff'd o. b. 16 *A. D.* 2d 809, 229 *N. Y. S.* 2d 736 (1962). The latter decision distinguished the early case of *Siefert v. City of Brooklyn,* 101 *N. Y.* 136, 4 *N. E.* 321 (Ct. App. 1886) wherein damages for flooding were awarded against the municipality because the defects in the system, manifest shortly after its inception, caused the collected sewage to be forced through the manholes and to inundate the plaintiffs' lands. The result was exacerbated by the subsequent adding to the

sewer line of the load of additional laterals. *Siefert* is consistent with the dictum in *Harrington* quoted above concerning liability for comparable invasion of private lands by collected sewerage waters.

A minority of jurisdictions has expanded municipal liability in this area to hold that if, in the adoption of a sewer plan, there is such negligence as amounts to more than a mere error in judgment the municipality will be liable. 18 *McQuillin, op. cit. supra,* § 53.122, p. 465. This point of view was apparently entertained by the Appellate Division in *Fagliarone v. North Bergen Tp.,* 78 *N. J. Super.* 154 (App. Div. 1963), certif. den. 40 *N. J.* 221 (1963), which held that an actionable nuisance resulted when the defendant municipality constructed a supplemental sewer line without "adequate prior testing and planning." (78 *N. J. Super.* at 157). We need express no opinion as to the soundness of the distinction drawn in that case between negligence and an "error in judgment" (*Id.* at 156) since the present record contains no evidence as to when or how the Newark sewer system was designed or planned or as to whether it failed to serve its purpose for an appreciable period of time after its inauguration. We cannot assume there was such failure, or, consequently, that there was negligence of any degree in the adoption of the original plan.

More pertinent to the present facts is another minority rule to the effect that if a sewer system as established proves inadequate "to keep pace with the increasing demands upon the resources of the artificial channels it has established" it must be changed to accommodate such demands at peril of liability. *City of Louisville v. Cope,* 296 *Ky.* 207, 176 *S. W.* 2d 390, 391 (Ct. App. 1943); and see *City of Macon v. Cannon,* 89 *Ga. App.* 484, 79 *S. E.* 2d 816 (Ct. App. 1954); *City of Holdenville v. Griggs,* 411 *P.* 2d 521 (Okl. Sup. Ct. 1966). More frequently it is held that if a sewer is adequate when constructed the municipality is not liable because of subsequent inadequacy occasioned by the growth of the municipality and the increased demands made upon the sewer.

18 *McQuillin, op. cit. supra*, § 53.123, p. 469. This position is qualified to the extent that liability will follow if in actual operation the system expels artificially collected sewage, whether sanitary or storm or both, into plaintiff's home or onto his land. *Tombari v. City of Spokane*, 197 Wash. 207, 84 *P*. 2d 678 (Wash. Sup. Ct. 1938); *Welch v. Kansas City*, 204 *Kan*. 765, 465 *P*. 2d 951 (Sup. Ct. 1970); *City of Perryton v. Steed*, 454 *S. W*. 2d 440 (Tex. Civ. App. 1970); *City of Northlake v. City of Elmhurst*, 41 *Ill. App*. 2d 190, 190 *N. E*. 2d 375 (Ct. App. 1963). This qualification is in thorough accord with our own decisions. *Gould & Eberhardt, Inc. v. City of Newark*, 6 *N. J*. 240, 243 (1951); *Kehoe v. Rutherford*, 74 *N. J. L*. 659 (E. & A. 1907); *Dohrmann v. Freeholders of Hudson*, 84 *N. J. L*. 689 (E. & A. 1913).[3]

As we have already stated, there is neither an express finding below nor a fair basis in the record for our independently finding as a fact (*R*. 2:10–5) that the flooding of plaintiffs' properties or their environs is essentially by waters cast upon them out of the sewer lines as distinguished from water which never got into the sewers. Thus a basis for imposing liability on the city through application of the doctrine of the "collected water" cases last above cited does not here exist.

Nor is this basically a case of damage because of failure to remedy a condition of disrepair, as in *Henry Clay v. Jersey City*, 74 *N. J. Super*. 490 (Ch. Div. 1962), aff'd 84 *N. J. Super*. 9 (App. Div. 1964), certif. den. 43 *N. J*. 264 (1964). The trial court did not so find, nor, as indicated above, do we.

 In view of the findings above and the void in the evidence as to when, subsequent to the inception of the drainage system, the flooding problem came into existence, the ultimate issue we confront on the damages aspect of the

---

[3]These New Jersey cases go off partly on the rationale of "active wrongdoing" in the performance of a governmental function, but we approve them as subserving justice independently of that approach. See note 1, *supra*.

case is this: Must Newark respond in damages to those injured by flooding which, on the natural inferences from the record, is the result of a gradually increasing functional incapacity of the sewer system effectively to drain the Frelinghuysen Avenue area because of urban development, in the upland and the meadows, which has increased the volume of tributary waters to the system and decreased the storage capacity of the meadows and the carrying efficiency of the run-off ditches? The hypothetical stated is posed, of course, against the constant of an average-elevation-differential, as between the flooding area and a Newark Bay mean high tide, of only $3\frac{1}{2}$ feet, and of a distance between the two of $2\frac{1}{2}$ to 3 miles.

We answer the question posed in the negative. First, there is no support in our law for the minority position alluded to above of a positive duty of the municipality to keep its sewer plant abreast of developing needs. Second, we conclude that too much of the official decision-making process in dealing with such a problem at the various phases of its development was grounded in governmental judgment and discretion to permit the sanction of an imposition of damages for the result of its exercise. This conclusion is fortified by the pertinent cases, old and new, both here and elsewhere. As already noted, the conception of the original plan for draining and sewering the area was an exercise of official judgment. *Harrington v. Woodbridge, supra.* Whenever, thereafter, serious flooding first appeared, governmental judgment and discretion had to be exercised as to whether or when to remedy it, or how, in terms of priorities of need as between that exigency and others the city faced. *Amelchenko v. Freehold Borough*, 42 *N. J.* 541, 549–550 (1964); *Fitzgerald v. Palmer, supra.* By the time plaintiffs began these actions in 1970 the difficulties in resolving the critical governmental problem presented had become badly compounded by the substantial and rising cost of the indicated remedy, the competing needs of the city in other directions and its intervening

fiscal deterioration. The problem for the responsible city officials never ceased to be one of exercise of discretionary judgment even though the option for continuing inaction on a solution became increasingly less tenable.

The doctrinal problem posed is not one of governmental immunity to suit but rather of the absence of a substantive basis for imposing liability in such circumstances. *A. & B. Auto Stores of Jones St. Inc. v. Newark,* 59 *N. J.* 5, 11 (1971); and see *Willis et al. v. Dept. of Cons. & Ec. Dev.,* 55 *N. J.* 534, 540 (1970). Compare *Weiss v. Fote,* 7 *N. Y.* 2d 579, 200 *N. Y. S.* 2d 409, 414, 167 *N. E.* 2d 63, 66 (Ct. App. 1960). But see Note, 56 *Iowa L. Rev.* 930, 961–65 (1971) commenting on the New Jersey cases in this discretionary field.

The default of the city in the respects complained of having at all times prior to institution of this action been of a nature involving exercise of legislative judgment and discretion, we conclude, for the reasons stated, that the defendant is not liable to plaintiffs for damages therefor.[4]

The foregoing conclusions also lead to a reversal of the mandatory injunction. An injunction would constitute a direct entry by the Court into a significant discretionary decision in the municipal fiscal area. However the city should be aware that a point could well be reached when continued inattention to serious and progressive injury to private in-

---

[4]This action having been based on claims accruing prior to July 1, 1972, the effective date of the New Jersey Tort Claim Act, *L.* 1972, c. 45, *N. J. S. A.* 59:1–1 *et seq.,* it is not affected by the provisions thereof. *N. J. S. A.* 59:12–3; 59:14–4. The act seems intended to codify existing case law in the area of exercise of governmental discretion by municipalities. See *N. J. S. A.* 59:2–3; Report of the Attorney General's Task Force on Sovereign Immunity (1972), pp. 212–13. We are not, however, to be understood as expressing any view as to the construction of any particular provision of the act but to be deciding this case solely on the basis of the law antedating the statute.

terests might have to be adjudged such an arbitrary failure to act as to compel judicial relief.

Reversed; no costs.

*For reversal*—Chief Justice WEINTRAUB, Justices HALL, and MOUNTAIN, and Judges CONFORD and LEWIS—5.

*For affirmance*—None.