BIRCHWOOD LAKES COLONY CLUB, INCORPORATED,
PLAINTIFF-RESPONDENT, v. BOROUGH OF MEDFORD
LAKES, DEFENDANT-APPELLANT.

Argued April 20, 1982—Decided August 3, 1982.

584

*Edward A. Kondracki* argued the cause for appellant (*Davis & Reberkenny,* attorneys).

*Matthew R. McCrink* argued the cause for respondent (*McCrink & Nelson,* attorneys).

*Jerry Fischer,* Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney).

*Alfred A. Porro, Jr.* submitted a brief on behalf of *amicus curiae* Authorities Association of New Jersey.

*William L. Forester* submitted a brief on behalf of *amicus curiae* New Jersey Institute of Municipal Attorneys (*Gant & Forester,* attorneys).

The opinion of the Court was delivered by

O'HERN, J.

The central issues in this appeal are (1) whether downstream owners may recover in nuisance for injury to their property caused by the discharge of municipal sewerage, and (2) whether the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 *et seq.,* (hereinafter TCA) applies. We hold that an action may be brought in nuisance against a public entity, and that the Tort Claims Act applies.

The history of the case is rather involved. The facts are set forth in detail in the Appellate Division opinion below. *Birchwood Lakes Colony Club, Inc. v. The Borough of Medford Lakes,* 179 *N.J.Super.* 409 (1981). A short summary will suffice for the issues before us.

Plaintiff, a representative organization of the residents of the Birchwood Lakes area, brought suit for damages and injunctive relief against the neighboring municipality, Borough of Medford Lakes. Plaintiff alleged that the Medford Lakes sewage treatment plant, owned and operated by the borough, discharged effluent with excessive levels of nitrates, ammonia, suspended solids and phosphates into plaintiff's lake, causing the lake to be over-enriched with nutrients. The discharge of excessive phosphates caused the proliferation of algae and aquatic weeds, which killed the lake's fish and made the lake unsuitable for

swimming, boating, fishing and any other recreational purposes. The once pleasant prospects of lakeside retirement living are claimed to have been severely diminished by the eutrophication [1] of the lake.

The Birchwood Lakes are located 500 feet downstream from the site where the Borough of Medford Lakes constructed its first sewage treatment plant in 1939 and began to pump treated sewage into the stream. In 1964, the plant was essentially rebuilt, undergoing extensive modifications with "only a couple of items from the old plant" remaining. The plans for both the original 1939 construction, as well as for the 1964 modifications, were approved by the State Department of Health, the department then responsible for the supervision of sewage treatment plants.

Sometime in 1969, residents of the area surrounding Birchwood Lakes began to notice mats of algae on the lakes, and from that time on, algae could be seen from late spring until early fall each year. The condition worsened so much that by the early 1970's, the lakes were rendered unusable during several months.

Following investigation in 1971, the Department of Environmental Protection (DEP) issued a report in March 1972 finding that the lakes were undergoing eutrophication and that the effluent discharged by the sewage plant contained amounts of phosphorous that exceeded DEP standards.

In September 1972, DEP ordered the borough to devise a plan and to begin disposing of its sewage prior to December 31, 1972 in a manner approved by the Department. The order further stated that a significant threat to the health of New Jersey

---

[1]Eutrophication has been defined as the deterioration of the aesthetic and life-supporting qualities of natural and man-made lakes and estuaries caused by over-fertilization from effluents containing phosphates, nitrogen, and organic substances. Algae and aquatic plants proliferate and, after decomposition, produce a sequence of objectionable features.

citizens was posed by the effluent discharge, which ultimately reached the Rancocas Creek, a tributary of the Delaware River.

The borough objected to the order. It contested the nature of the problem, the appropriate steps to be taken, the source of the financing, and the deadlines for correcting the problem. After negotiations the borough was issued a construction permit in 1974 for additions and improvements to the plant. The borough appropriated $74,000 for the improvements, but the bids received were in excess of the appropriation, and all were rejected.

Finally, after further delay, the Department filed suit to compel the borough to abate the pollution. A consent judgment in June 1977 stipulated several alternate methods for abating the effluent discharge. Construction was to be completed by January 1979. The record does not state whether the borough has complied with the injunction.

Meanwhile, the present suit was filed in July 1975. At trial in May 1978, plaintiff presented various theories of liability,[2] which included:

active wrongdoing prior to July 1, 1972 (the effective date of the Tort Claims Act, *N.J.S.A.* 59:1–1 *et seq.*) which was a proximate cause of plaintiff's damage; negligent construction of the sewage treatment plant; actual or constructive knowledge by defendant that it was operating the plant "in a manner which was damaging plaintiff's lake by reason of which a duty arose, a duty on the part of the defendant, to correct the problem" and defendant's failure to discharge its duty resulting proximately in the damages complained of; defendant's failure to observe the conditions of the federal operating permit, to obey the departmental order and to obey the consent judgment; and negligent operation by defendant of the sewage treatment plant. [179 *N.J.Super.* at 417].

The court instructed the jury on all of the issues and submitted 12 special interrogatories to them. The jury found that the defendant had been negligent in failing to take corrective steps to prevent the excessive discharge of nutrients from its sewer

---

[2]Prior to commencing the trial, the parties and the trial judge discussed the theories under which the case should be tried. Although the plaintiff pled nuisance and trespass theories in the complaint, the trial court found the nuisance theory superfluous, as nuisance based in strict liability is not permitted under the Tort Claims Act.

treatment plant and to observe the conditions imposed on the limitation of the emission of phosphorous as required in its operating permit issued in 1974. In each of these instances, the jury found that the negligence was the proximate cause of plaintiff's injury. It also found, however, that the defendant was not negligent in the operation, planning or design of the plant, nor was it negligent "in response to the Department of Environmental Protection Order" issued in 1972. Damages of $45,000 were awarded to the plaintiff. Plaintiffs also were successful on their motion for expert fees of $2500.

On defendant's appeal, the Appellate Division held that the jury's finding that the borough negligently failed to observe the conditions of its 1974 operating permit was not supported by the record since the operating permit did not require a low phosphate concentration until the fall of 1976, and there was no proof of additional damage caused by phosphates after that date. Moreover, the court found a contradiction between two of the jury's findings. On the one hand, there was a broad finding that the borough failed to discharge a duty to take corrective steps to end the pollution. On the other hand, the jury found that the borough was not negligent in its response to the 1972 DEP order. That order, however, called upon the borough to take the only feasible corrective step—the construction of additional facilities. Therefore, the jury reached opposite findings on what was essentially the same issue.

The Appellate Division went on, however, to consider the borough's liability in nuisance. As to this, the court stated:

> We are satisfied, setting aside for the moment the further issue of discretionary or other immunity, that the borough, as operator of a sewage disposal plant, would be subject to liability for compensatory damages if the effluent from its plant unreasonably polluted waters, thereby depriving the riparian owner of the use and enjoyment thereof or otherwise caused injury to such owner. It would not matter that the activity complained of commenced prior to the effective date of the Tort Claims Act and continued thereafter. [179 *N.J.Super.* at 424].

Since the borough could not be liable for nuisance unless its actions were unreasonable, and since that issue was not presented to the jury, the Appellate Division concluded that the trial

judge's failure to include instructions on the nuisance theory amounted to plain error, requiring a new trial on the issue of liability only. *Id.* at 432–33. With respect to the Tort Claims Act defenses, the court found that the act did not provide the borough with immunity from suit, and that the borough had, and did not sustain, the burden of proving that design immunity was applicable here. With respect to the award of experts' fees to plaintiffs, the court found the award erroneous. Under the applicable statute, *N.J.S.A.* 2A:35A–1 *et seq.*, such a fee is available only to a prevailing party who sought declaratory or equitable relief under the act. Since the trial court denied the injunction on the basis that one was pending in the companion DEP suit, plaintiff was not a prevailing party, and thus was deemed not entitled to fees.

We granted defendant's petition for certification. 88 *N.J.* 478 (1981). Plaintiff did not cross-petition. The Court thereafter invited the Attorney General of New Jersey to appear as *amicus curiae.*

I.

The defendant and the Attorney General argue that the Tort Claims Act, *N.J.S.A.* 59:1–1 *et seq.*, constitutes the exclusive source of public entity tort liability and that since the act does not expressly authorize suits in nuisance against public entities, the effect of the decision below is to allow a common law cause of action in nuisance independent of the Tort Claims Act. On the contrary, the Appellate Division found that the Tort Claims Act includes liability for nuisance and that no statutory immunity could be found as a matter of law on the record before it.

Private nuisance is but one possible theory for recovery of damages caused by the invasion of one's interest in the private use and enjoyment of land. That interest may be invaded by more than one type of conduct, i.e., the conduct may be intentional, it may be unintentional but caused by negligent or reckless conduct, or it may result from an abnormally danger-

ous activity for which there is strict liability.[3] One is subject to liability for private nuisance if the invasion is either

(a) intentional and unreasonable, or

(b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities. [*Restatement (Second) of Torts*, § 822 (1979)].

The conduct necessary to make the actor liable for a private nuisance may consist of an act or a failure to act under circumstances in which the actor is under a duty to take positive action to prevent or abate an interference. *Restatement (Second) of Torts*, § 824 (1979). An invasion is intentional if the actor purposely causes it or knows that the invasion is substantially certain to result from his conduct. An intentional invasion of another's use is unreasonable if:

(a) the gravity of the harm outweighs the utility of the actor's conduct, or

(b) the harm caused by the conduct is serious and the financial burden of compensating for this and similar harm to others would not make the continuation of the conduct not feasible. [*Restatement (Second) of Torts*, § 826 (1979)].

■ There is no question that an invasion of one's interest in the use of downstream waters may constitute a nuisance. *Harrisonville v. W. S. Dickey Clay Mfg. Co.*, 289 *U.S.* 334, 53 *S.Ct.* 602, 77 *L.Ed.* 1208 (1933); *City of Oxford v. Spears*, 228 *Miss.* 433, 87 *So.2d* 914 (1956); *Ruth v. Aurora Sanitary District*, 17 *Ill.* 2d 11, 158 *N.E.2d* 601 (1959); Annot., 75 *A.L.R.* 529 (1931); *Restatement (Second) of Torts*, § 832 (1979). New Jersey long ago recognized that the pollution of a watercourse may constitute an actionable nuisance. *Beach v. Sterling Iron and Zinc Co.*, 54 *N.J.Eq.* 65 (Ch. 1895), aff'd *sub nom. Sterling Iron and Zinc Co. v. Sparks Manufacturing Co.*, 55 *N.J.Eq.* 824 (E. & A. 1896). Moreover, municipalities were held liable for nuisance resulting in water pollution, although the legal analysis upon which liability was based, active wrongdoing, is now outdated. *See Bengivenga v. Plainfield*, 128 *N.J.L.* 418 (E. & A. 1942);

---

[3]*N.J.S.A.* 59:9–2(b) provides that no judgment shall be granted against a public entity in New Jersey on the basis of strict liability.

*Ennever v. Bergenfield*, 105 *N.J.L.* 419 (E. & A. 1928); *Garrison v. Fort Lee*, 92 *N.J.L.* 566 (E. & A. 1918). Our courts have held that the discharge of treated sewage effluent into a running stream is not necessarily an unreasonable riparian use in today's civilization, but that it may be unreasonable if the harm from doing so outweighs the benefit. *Borough of Westville v. Whitney Home Builders*, 40 *N.J.Super.* 62, 68 (App.Div.1956). In *Borough of Westville* it was noted that

> a determination as to the existence of an actionable invasion of the unquestionable property right of a riparian owner ... depends upon a weighing of the reasonableness, under all the circumstances, of the use being made by the defendant and of the materiality of the harm, if any, found to be visited by such use upon the reasonable uses of the water.... [40 *N.J.Super.* at 85].

This rule is consistent with the general New Jersey rule pertaining to competing interests in water rights, that reasonableness should be the guiding principle. *Armstrong v. Francis Corp.*, 20 *N.J.* 320 (1956). *See also Sans v. Ramsey Golf and Country Club, Inc.*, 29 *N.J.* 438, 449 (1959). For the pre-TCA history of municipal tort liability in New Jersey see *Cloyes v. Delaware Township*, 23 *N.J.* 324 (1957).

■ For two reasons we hold public entity liability for nuisance is recognized under the Tort Claims Act. First, sections of the Tort Claims Act may be interpreted as making public entities liable for nuisance under the standards provided by the act, and second, in light of the history of municipal liability in this area, we perceive no intent to eliminate this liability.

With respect to the statutory recognition and continuation of the nuisance cause of action, the two sections of the act implicated are *N.J.S.A.* 59:4–2 and *N.J.S.A.* 59:2–2. The former creates liability for injury caused by the dangerous condition of a public entity's property. It provides:

> 59:4–2. Liability generally
>
> A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:
>
> a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

b. a public entity had actual or constructive notice of the dangerous condition under section 59:4–3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.

Thus, this section imposes liability upon a municipality in its status as property owner for nuisance where its actions can be found to be "palpably unreasonable." The comment to section 4–2 states "[i]t is anticipated that this section will be developed to the extent possible in accordance with common law principles of landowner liability." [4] Certainly, at common law, the municipality could be held liable in nuisance for water pollution, and this section continues that liability subject to the "palpably unreasonable" standard.

*N.J.S.A.* 59:2–2 incorporates the doctrines of vicarious liability and *respondeat superior.* It provides:

59:2–2. Liability of public entity

a. A public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances.

b. A public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable.

Thus, this section makes the public entity liable for the acts and omissions of public employees to the same extent and in the same manner as a private individual under like circumstances. As the comment to this section indicates, "[w]hile the general approach of this act is immunity unless liability, this section provides a flexible liability provision which will permit the courts to adapt the principles established in this act to the particular circumstances of the cases coming before them." A private individual would be potentially liable in nuisance under circumstances similar to those here. Thus, we glean no intent to

---

[4] The comments referred to in this opinion are from the *Report of the Attorney General's Task Force on Sovereign Immunity—May 1972* that accompanied the draft of the New Jersey Tort Claims Act.

exempt public entities from liability for nuisance using nuisance principles.

We often look to interpretations of the California Tort Claims Act (Cal. Gov't Code § 820.2) and the United States Tort Claims Act (28 *U.S.C.A.* § 2680(a)) for guidance in construction of our own statute. *Brown v. Brown*, 86 *N.J.* 565, 574, 577 (1981); *Costa v. Josey*, 83 *N.J.* 49, 56 (1980). Under the California act, nuisance created by aircraft landing patterns was held actionable. *Nestle v. City of Santa Monica*, 6 *Cal.2d* 920, 496 *P.2d* 480, 101 *Cal.Rptr.* 568, 496 *P.2d* 480 (1972). The court held that a public entity could be subject to liability under either the California TCA provisions relating to dangerous conditions of public property or under California's nuisance statute. *Id.* at 488, 101 *Cal.Rptr.* 568, 496 *P.2d* 480.

Similarly, in *Dahlstrom v. United States*, 228 *F.2d* 819 (8th Cir. 1956), the Court of Appeals allowed recovery under the federal tort claims act for nuisance caused by low flying planes. That court relied partly on the federal section parallel to our section *N.J.S.A.* 59:2–2 that imposes liability on public entities to the same extent as would be imposed upon private individuals under like circumstances. *Id.* at 822.

Moreover, recovery in early nuisance cases was founded upon the principle that nuisance is tantamount to a taking without just compensation. As noted in 1895 in *Beach, supra*, 54 *N.J.Eq.* at 79, "the maintenance of a nuisance . . . is, in effect, a taking of property." This concept was, similarly, one basis for recovery prior to the adoption of the federal tort claims act. In *United States v. Causby*, 328 *U.S.* 256, 66 *S.Ct.* 1062, 90 *L.Ed.* 1206 (1945), Justice Douglas found that significant interference with the use and enjoyment of a farm caused by low flying military planes constituted a taking in violation of the Fifth Amendment. The Court strongly hinted that it was able to reach this result in the absence of a finding of near complete destruction only because it was able to characterize the governmental interference as "use" of the claimant's property. *Id.* at 262 n.7, 66

*S.Ct.* at 1066 n.7. *See, Ortega Cabrera v. Municipality of Bayamon,* 562 *F.*2d 91 (1st Cir. 1977); *Sundell v. Town of New London,* 119 *N.H.* 839, 409 *A.*2d 1315 (1979); Note, "Strict Liability Under the Massachusetts Tort Claims Act," 3 *Western New England Law Review* 617 (1981).

 In sum, we conclude that the Appellate Division correctly held that an action in nuisance may be maintained against a municipality under and subject to the standards of the Tort Claims Act.[5] To achieve consistency between the common law principles and the legislative intent, we modify the Appellate Division holding to require that it be shown that the action taken or failure to act by the public entity was palpably unreasonable, as required by *N.J.S.A.* 59:4–2.

## II.

The next question is whether the Tort Claims Act provides immunity from liability for nuisance. The comment to *N.J.S.A.* 59:2–1 makes clear that the statute is "intended to insure that any immunity provisions provided in the act or by common law will prevail over the liability provisions." Immunity is the dominant consideration of the act. See, *e.g., Malloy v. State,* 76 *N.J.* 515, 519 (1978). The same comment further states, "[i]t is anticipated that the Courts will realistically interpret both the statutory and common law immunities in order to effectuate their intended scope." The municipality raises two immunities on its behalf here: plan and design immunity conferred by

---

[5]To hold otherwise would seriously implicate an unconstitutional invasion of the riparian owner's interests. *Masley v. City of Lorain,* 48 *Ohio St.*2d 334, 358 *N.E.*2d 596 (1976); *Glace v. Town of Pilot Mountain,* 265 *N.C.* 181, 143 *S.E.*2d 78 (1965). A public entity's decision consciously to defer improvement of its treatment works when inadequately treated waste is cast upon another's property is similar to a taking of the downstream owner's property to achieve the public purpose.

*N.J.S.A.* 59:4–6, and discretionary immunity conferred by *N.J. S.A.* 59:2–3.

Interpretation of the statutory immunities requires a review of the legislative history regarding regulation of public sewer systems. In cooperation with the federal government, New Jersey has devised a comprehensive program of water pollution control. In 1972, Congress, recognizing that "the Federal water pollution control program . . . has been inadequate in every vital aspect," S.Rep.No.92–414, 92d Cong., 1st Sess. 7 (1972), U.S.Code Cong. & Admin.News, p. 3668, passed the Federal Water Pollution Control Act Amendments of 1972, Pub.L.No. 92–500, 86 Stat. 816. The amendments established a new system of regulation under which it is illegal for anyone to discharge pollutants into the nation's water without a permit. See 33 U.S.C.A. §§ 1311, 1342. *Milwaukee v. Illinois,* 451 *U.S.* 304, 309, 101 *S.Ct.* 1784, 1788, 68 *L.Ed.2d* 114, 122 (1981). To the extent that the Environmental Protection Agency, charged with administering the act, has promulgated regulations establishing specific effluent limitations, those limitations are incorporated as conditions of the permit. *See generally EPA v. State Water Resources Control Board,* 426 *U.S.* 200, 96 *S.Ct.* 2022, 48 *L.Ed.2d* 578 (1976). Permits are issued either by the EPA or a qualifying state that has enacted programs to implement the regulatory provisions of the federal act.

New Jersey enacted legislation setting forth the powers and responsibilities of the New Jersey Department of Environmental Protection for administering the State's water pollution control program. This enabled the State to implement the permit system required by the federal act and allows New Jersey to administer the program. Water Pollution Control Act, *L.* 1977, *c.* 74; *N.J.S.A.* 58:10A–1 *et seq.* New Jersey's act prohibits the discharge of any pollutant except in conformity with a valid permit to do so. A permittee is required to meet the effluent standards under the federal and state law, to meet schedules for compliance with the terms of the permit, and to apply for a new

permit in the event of facility expansion or a change in the quality or quantity of pollutants discharged.[6]

Taken in their entirety, these programs establish a comprehensive program of water pollution regulation. An understanding of these regulatory principles may be used to harmonize the application of the specific defenses under the Tort Claims Act.

## A.

 If a public entity plans and designs its treatment works in conjunction with DEP or other regulatory authority so that the plant will comply with the approved effluent limitation, it will not be responsible if discharge at the permissible level causes injury. *N.J.S.A.* 59:4–6 provides:

a. Neither the public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of public property, either in its original construction or any improvement thereto, where such plan or design has been approved in advance of the construction or improvement by the Legislature or the governing body of a public entity or some other body or a public employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved.

 To the extent the discharge permit establishes or authorizes specific conditions[7] for the effluent discharge and the entity complies with those conditions, it will be immune from monetary liability. This is because state and federal governments have the paramount right, within constitutional bounds, to determine what is in fact a reasonable use of water resources. *Cf. Arizona v. California,* 373 *U.S.* 546, 564, 83 *S.Ct.* 1468, 1479, 10 *L.Ed.2d* 542, 558 (1963) (once Congress determines entitlements to mainstream water, courts have no power to determine "equitable apportionment"); *Milwaukee v. Illinois, supra,* 451

---

[6]To clarify, prior to 1977, the powers and duties relating to sewage disposal and pollution of waters were contained in *N.J.S.A.* 58:12–2, as amended from time to time. *See L.*1966, *c.* 250, *L.*1970, *c.* 91, *L.*1972, *c.* 44.

[7]These conditions may include, *inter alia,* the levels, frequency, and content of effluent discharges.

*U.S.* at 324, 101 *S.Ct.* at 1796, 68 *L.Ed.*2d at 131 (federal courts should not apply common law nuisance standards in face of comprehensive regulatory program supervised by an expert administrative agency); *Committee For Jones Falls Sewage System v. Train*, 539 *F.*2d 1006 (4th Cir. 1976) (under Maryland law, citizens not entitled to remedy against public sewer system having met EPA permit standards); *Wilson v. United States*, 425 *F.Supp.* 143 (E.D.Va.1977) (oystermen may bring action against public entities predicated on negligence, nuisance, or trespass theories); *see also Middlesex Cty. Sewerage Auth. v. Sea Clammers*, 453 *U.S.* 1, 101 *S.Ct.* 2615, 69 *L.Ed.*2d 435 (1981).

Conversely, the public entity will remain liable if it elects to defer installation, repair, or improvement of the works when the level of discharge by the regulatory body has not been set or if set, not met and injury results. Similarly, it remains liable for negligent operation or construction. Although plan or design immunity does not depend upon any showing of the reasonableness of the design, nor can it be lost by changed circumstances, Comment, N.J.S.A. 59:4–6, it does not suffice for the public entity to show that works were constructed under a permit. For, although liability cannot be based on the inadequacy of the design or plan, immunity from liability for an independent affirmative act (such as the claimed discharge of high amounts of phosphates and nutrients) is afforded in the first instance only for an approved feature of the plan or design. We concur that

> a fair reading of this immunity provision compels the conclusion that the prerequisite fact which must be proved in order for the [public entity's] burden [of proof] to be deemed to have been successfully carried is that the *specific design or plan detail* alleged to constitute the dangerous condition *was the subject of prior governmental approval* or in conformity with prior approved standards. [*Ellison v. Housing Authority of South Amboy*, 162 *N.J.Super.* 347, 351 (App.Div.1978) (emphasis supplied) ].

In *Ellison, supra*, the housing authority was required to show that both the manner of hanging the screen doors and the size of the concrete entrance porches were included in the federal government's plans and specifications. *See also Rodgers v.*

*Passaic Housing Authority,* 139 *N.J.Super.* 569 (App.Div.1976), certif. den., 71 *N.J.* 337 (1976) (original federal plan and specifications provided that piping need not be insulated; housing authority found immune because plan contemplated specific condition which caused injury). Moreover, the public entity bears both the burden of pleading the affirmative defense[8] and the burden of proof.

### B.

The section that confers immunity based upon discretionary activities is *N.J.S.A.* 59:2–3. It reads as follows:

a. A public entity is not liable for an injury resulting from the exercise of judgment or discretion vested in the entity;

b. A public entity is not liable for legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature;

c. A public entity is not liable for the exercise of discretion in determining whether to seek or whether to provide the resources necessary for the purchase of equipment, the construction or maintenance of facilities, the hiring of personnel and, in general, the provision of adequate governmental services;

d. A public entity is not liable for the exercise of discretion when, in the face of competing demands, it determines whether or how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel unless a court concludes that the determination of the public entity was palpably unreasonable. Nothing in this section shall exonerate a public entity for negligence arising out of acts or omissions of its employees in carrying out their ministerial functions.

The Appellate Division correctly affirmed the denial of defendant's motions for judgments in its favor based on discretionary immunity as a matter of law.

In *Brown, supra,* 86 *N.J.* at 577–78, the Court held that when immunity of the public entity comes within a specific subsection, then the general provision that the public entity is

---

[8]The borough did not specifically include plan or design immunity among the separate defenses pleaded in its answer. However, the borough did raise the issue as one of several grounds for its unsuccessful motion made for judgment at the end of plaintiff's case and at the end of the entire trial. The Appellate Division considered the borough's answer amended so as to incorporate the defense as if specifically pleaded. As we indicated earlier this term in *Rivera v. Gerner,* 89 *N.J.* 526 (1982), better practice would be to plead specifically the separate statutory affirmative defenses given to public entities under the act. See *Ellison, supra,* 162 *N.J.Super.* at 351.

not liable for injury resulting from the exercise of discretion does not apply. Here no particular subsection was pleaded. As to sections (b) and (c), the municipality agreed that it was required to seek or to provide the necessary funds to comply with the DEP order.[9] As to subsection (d), there was inconclusive proof in the record of substantial competing demands.[10] The plant was a revenue producing facility. The municipality authorized a $74,000 bond issue to finance the plant reconstruction and planned to pay off the debt over a number of years, and then rejected the bids when they came in, some only slightly above the appropriated figure. The record does not disclose that the municipality rebid, modified the specifications, or took any other action. Although the defendant claimed that available funds were restricted by the municipal budget "Cap Law," *N.J.S.A.* 40A:4–45.2, the capital expenditure needed to be made here was arguably exempt from the 5% increase in spending ceiling. *N.J.S.A.* 40A:4–45.3(b), (g) or (j). Although the municipality agreed that it had the responsibility, it, in effect, appeared to do nothing to abate the pollution, avoiding the DEP order requiring it to do so.

Subsection (a) may apply here. As the Court explained in *Costa, supra,* 83 *N.J.* at 59, subsection (a)

> concerns the "exercise of judgment or discretion" in making basic policy—the type made at the planning, rather than the operational level of decisionmaking. Moreover, immunity is contingent upon proof that discretion was actually exercised at that level by an official who, faced with alternative approaches, weighed the competing policy considerations and made a conscious choice.

On this record, we view the continuous discharge of the pollutant as in the nature of "operations," not "planning," as defined in *Costa v. Josey, supra.*

---

[9]*Massaker v. Petraitis,* 173 *N.J.Super.* 459 (App.Div.1980), sustaining state immunity for non-allocation of resources to hire additional deputy clerks, obviously did not involve an intentional invasion of another's property. Nor does this case involve an affirmative decision not to fund the necessary changes.

[10]If found, a bona fide exercise of discretion in this regard continues to insulate a municipality from liability.

Our holding is consistent with *Barney's Furniture Warehouse v. Newark,* 62 *N.J.* 456, 467–68 (1973), a pre-Tort Claims Act case that held that although a municipality is not liable for the gradually increasing functional incapacity of its sewer system, it remains liable for negligent operation or repairs and would be liable if in actual operation the system expels artificially collected sewage upon a claimant's property.[11]

Accordingly, we hold that a public entity will be immune from liability for claims of damages from public sewer discharges when the amount of discharge is incorporated into the plan and design "approved in advance" by the body exercising "discretionary authority to give such approval," *N.J.S.A.* 59:4–6, so long as the works are thereafter operated with reasonable care and in accordance with the permit requirements. The public entity may also be immune from liability if, on remand, it carries its burden of proof on the issues of discretion set forth in *N.J.S.A.* 59:2–3.

## III.

Application of these principles is complicated in this case because the claim is based upon activity both before and after July 1, 1972, the effective date of the Tort Claims Act. We agree with the Appellate Division that the record did not sustain

---

[11]*Barney's Warehouse, supra,* involved claims of damage by property owners whose premises were periodically flooded by water backup following rainfall. The Court concluded that "by far, the greater portion of the floodwaters . . . consists of either precipitation or back-flow of surface water. . . ." *Id.* at 462. The Court held there was no affirmative municipal duty to keep its storm water system abreast of municipal growth and no showing that "collected waters" were cast upon plaintiffs' lands. *Id.* at 468.

In *Woodsum v. Pemberton Tp.,* 177 *N.J.Super.* 639 (App.Div.1981), the court left for another day the question of whether construction of a new municipal water works involved a "taking" of the water rights of private well owners since the owners had been compensated for the necessary deepening of their wells.

the jury's finding that the borough was "negligent in failing to observe the conditions of its operating permit" since the permit did not establish a phosphate limit until the fall of 1976 and there was no proof of additional damages after that date. We also concur that there is an inherent contradiction between the jury's finding that the borough failed to discharge a duty to take corrective steps to end the pollution and its other finding that the borough was not negligent in its response to the 1972 DEP order, which called for the only feasible corrective steps— the construction of additional facilities. We believe the result here was contradictory because of the legal theory applied to the case. The focus on remand will be the reasonableness of the municipality's use weighed against the extent of the harm.

To reiterate, the borough will not be liable for damages caused after its permit acquisition to the extent that the permit established specific conditions for effluent discharge and those conditions were complied with. In addition, the municipality will not be liable for damages resulting from a specific plan or design, to the extent that the plan or design is intended to achieve the specified levels of removal of pollutants. Nor will it be liable if it sustains the burden on the issue of discretion. Should the defendant prevail on the establishment of immunity under the TCA, the jury will be instructed to apportion the damages between pre- and post-1972 injury. As noted above, after July 1, 1972, it will be necessary to find that the borough's action was palpably unreasonable in order for plaintiff to recover for nuisance. Again, if necessary, damages should be apportioned.

We leave undisturbed the lower court's findings on the issues of notice under the Tort Claims Act and the statute of limitations applicable in this action. These issues were fact-sensitive and no meritorious question of their correctness was raised. The jury's determination of the amount of damages is left undisturbed; only the issue of liability is subject to remand.

The Appellate Division's denial of award of experts' fees is affirmed.[12]

As modified the judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ, and Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—7.

*For reversal*—None.

---

[12]On remand, it may be appropriate for plaintiff to reinstate its request for injunctive relief should defendant be found to have failed to comply with the June 27, 1977 consent order in the companion DEP case.